1    David M. Arbogast (SBN 167571)
     David@SpiroMoss.com
2    Ira Spiro (SBN 67641)
     Ira@SpiroMoss.com
3    **SPIRO MOSS BARNESS LLP**
     11377 W. Olympic Boulevard, Fifth Floor
4    Los Angeles, CA 90064-1683
     Phone: (310) 235-2468; Fax: (310) 235-2456
5
     Paul R. Kiesel, Esq. (SBN 119854)           Jonathan Shub (SBN 237708)
6    kiesel@kbla.com                             jshub@seegerweiss.com
     Patrick DeBlase, Esq. (SBN 167138)          **SEEGER WEISS LLP**
7    deblase@kbla.com                            1515 Market Street, Suite 1380
     Michael C. Eyerly, Esq. (SBN 178693)        Philadelphia, PA 19107
8    eyerly@kbla.com                             Phone: (215) 564-2300; Fax (215) 851-8029
     **KIESEL BOUCHER LARSON LLP**
9    8648 Wilshire Boulevard                     Jeffrey K. Berns, Esq. (SBN 131351)
     Beverly Hills, California 90211             jberns@jeffbernslaw.com
10   Phone:  (310) 854-4444                      **LAW OFFICES OF JEFFREY K. BERNS**
     Fax:  (310) 854-0812                        19510 Ventura Boulevard, Suite 200
11                                               Tarzana, California 91356
                                                 Phone: (818) 961-2000; Fax: (818) 867-4820
12   Attorneys for Plaintiffs and all others Similarly Situated

13                  **UNITED STATES DISTRICT COURT**

14                 **NORTHERN DISTRICT OF CALIFORNIA**

15
     ARMANDO PLASCENCIA, and MELANIA )           **CASE NO. C-07-4485 CW**
16   PLASCENCIA, individually and on behalf of )
     all others similarly situated,            )    CLASS ACTION
17                                             )
                         Plaintiffs,           )
18                                             )   **DECLARATION OF DAVID M. ARBOGAST IN**
                                               )   **SUPPORT OF PLAINTIFFS' OPPOSITION TO**
19         v.                                  )   **DEFENDANT'S MOTION TO DISMISS**
                                               )
20                                             )
     LENDING 1st MORTGAGE and LENDING )
21   1st MORTGAGE, LLC, and DOES 1 through )        Hearing Date: April 3, 2008
     10 inclusive,                            )    Time:         2:00 p.m.
22                                            )    Place:        Courtroom 2
                         Defendants.          )    Judge:        Hon. Claudia Wilken
23                                            )
                                              )
24   _____ )    Complaint Filed: August 29, 2007
                                              )    Trial Date: Not set yet.
25

26

27

28

1    1.    I am an active member of the State Bar of California, admitted December, 1993, and I am

2    a member of the Bar of this Court.  I am one of the attorneys of record for Plaintiffs in this action.

3    2.    **Exhibit 1**, attached hereto is a true and correct copy of relevant pages from <u>Rules and

4    Regulations - Federal Reserve System</u>, 12 CFR Part 226, April 3, 1995;

5    3.    **Exhibit 2**, attached hereto is a true and correct copy of relevant pages from the

6    November 2006 Update, <u>Truth-in- Lending Manual</u>, Ralph C. Clontz, Jr. & James H. Pannabecker;

7    4.    **Exhibit 3**, attached hereto is a true and correct copy of the Federal Reserve Board Office

8    of Thrift Supervision's *Consumer Handbook on Adjustable Rate Mortages*, revised and reprinted June

9    2001.

10    5.    **Exhibit 4**, attached hereto is a true and correct copy of the December 26, 2006 "Joint

11    Press Release" from the Board of Governors of the Federal Reserve System Office of Thrift

12    Supervision, entitled *Federal Reserve Board and Office of Thrift Supervision Issue Revised Consumer

13    Handbook on Adjustable-Rate Mortgages*.

14    I declare under penalty of perjury under the laws of the United States of America that the

15    foregoing is true and correct and was executed in the State of California on March 13, 2008.

16

17    _____
        */s/*
18    DAVID M. ARBOGAST

19

20

21

22

23

24

25

26

27

28

DECL. OF DAVID M. ARBOGAST I.S.O. MTN. TO DISMISS - C-07-4485 CW

**Exhibit No. 1**

Westlaw.

60 FR 16771-01                                                      Page 1
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

RULES and REGULATIONS

FEDERAL RESERVE SYSTEM

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Truth in Lending

Monday, April 3, 1995

*16771 AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

SUMMARY: The Board is publishing revisions to the official staff commentary to Regulation
Z (Truth in Lending).  The commentary applies and interprets the requirements of
Regulation Z. The revisions clarify regulatory provisions and provide further guidance
on issues of general interest, such as the treatment of various fees and taxes associated
with real estate-secured loans and a creditor's *16772 responsibilities when
investigating a claim of the unauthorized use of a credit card.

DATES: This rule is effective April 1, 1995.  Compliance is optional until October 1,
1995.

FOR FURTHER INFORMATION CONTACT: For Subparts A and B (open-end credit), Jane Jensen Gell
or Obrea Otey Poindexter, Staff Attorneys; for Subparts A and C (closed-end credit), Kyung
Cho-Miller, Sheilah A. Goodman, W. Kurt Schumacher, Natalie E. Taylor, or Manley Williams,
Staff Attorneys, Division of Consumer and Community Affairs, Board of Governors of the
Federal Reserve System, at (202) 452-3667 or 452-2412; for the hearing impaired only,
Dorothea Thompson, Telecommunications Device for the Deaf, at (202) 452-3544.

SUPPLEMENTARY INFORMATION:

I. Background

 The purpose of the Truth in Lending Act (TILA; 15 U.S.C. 1601 et seq.) is to promote
the informed use of consumer credit.  The act requires creditors to disclose credit terms
and the cost of credit as an annual percentage rate (APR).  The act requires additional
disclosures for loans secured by a consumer's home, and permits consumers to cancel
certain transactions that involve their principal dwelling.  It also imposes limitations
on some credit transactions secured by a consumer's principal dwelling.  The act is
implemented by the Board's Regulation Z (12 CFR part 226).  The regulation authorizes
the issuance of official staff interpretations of the regulation. (See Appendix C to
Regulation Z.) The Board has published a staff commentary to Regulation Z which clarifies
existing law and provides guidance to creditors in applying the regulation to specific
transactions (Supplement I of this part). The Board updates the commentary periodically
as a substitute for individual staff interpretations.

 In December, the Board published proposed amendments to the commentary to Regulation
Z (59 FR 64351, December 14, 1994).  The Board received about 150 comments.  Nearly 90%
were from creditors or their representatives; the remainder were from consumer advocates,
government officials, and individuals. Overall, commenters generally supported the
proposed amendments.  Views were mixed on a number of comments, and some commenters
expressed concerns about issues not addressed in the proposal.  Except as discussed
below, the commentary has been revised as proposed; some technical suggestions or concerns

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                              Page 2
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

raised by commenters are addressed.  Compliance with the amendments is mandatory on
October 1, 1995.

II. Commentary Revisions

*Subpart A--General*

Section 226.2--Definitions and Rules of Construction

*2(a) Definitions*

*2(a)(17) Creditor*

*Paragraph 2(a)(17)(i)*

   Comment 2(a)(17)(i)-8 clarifies the identity of the creditor for participant loans from
an employee savings plan, such as 401(k) plans.  The proposal would have clarified that
the plan (and not the plan trust or trustee) is the creditor for purposes of the TILA.

   Some commenters asked for further guidance when the plan's trust or trustee provide
disclosures for the plan's participant loan program.  The comment is revised from the
proposal for clarity. Creditors should look to the plan (not the trust or trustee) to
determine whether the numerical tests for coverage have been met. The person to whom the
participant's loan is initially made payable (whether the plan, the trust, or the trustee)
is responsible for Regulation Z compliance for participant loans.

Section 226.4--Finance Charge

*4(a) Definition*

   Comment 4(a)-1 is revised as proposed to indicate that section 12 of the Real Estate
Settlement Procedures Act (RESPA; 12 U.S.C. 2610) prohibits creditors from charging fees
for preparing TILA disclosure statements in RESPA-covered transactions.  The comments
generally supported the revisions.

   The Board received a substantial number of comments relating to the proposed revision
to comment 4(a)-3 on fees charged by third parties.  While most commenters believed that
the comment helped clarify the treatment of third-party fees generally, the examples of
settlement agent charges, mortgage broker fees, and taxes raised a number of questions.

   Creditors had expressed concern about some charges imposed by loan-closing agents being
imputed to the creditor.  Some had indicated that despite the fact that they require the
use of a closing agent (and in limited ways the agent acts on behalf of the creditor),
in the modern mortgage lending environment, creditors do not have control over certain
fees that may be charged to consumers by these entities, particularly where there is no
affiliation between the creditor and the third party, as is often the case.  To address
this concern, the proposed revision to comment 4(a)-3 provided by example that if a
particular fee imposed by a settlement agent is not required or retained by the creditor,
the fee is not a finance charge, even though the creditor requires use of a third party.

   Comment 4(a)-3, which applies to all types of credit extensions (not just home-purchase
or other home-secured loans), is revised in the final version to clarify the general
third-party rule.  Upon further analysis, guidance about fees charged by settlement
agents in real estate-secured transactions is provided in a separate comment 4(a)-4.
This new comment gives the general rule for evaluating settlement agent fees, and is
followed by an example. Comments previously numbered 4(a)-4 through -6 are now renumbered.

   Many commenters also requested further clarification on the example of mortgage broker
fees as a finance charge.  The proposed clarification responded to questions about the
existing mortgage broker fee example, which had been added to address programs offering
lower rates and clearly more favorable terms to borrowers who use the creditor's
affiliated mortgage broker than to borrowers who apply to the creditor directly.  The
particular example has been deleted; while the mortgage broker fee charged in this
instance is still considered a finance charge, it is a much less common practice today,

                ©   2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and therefore has caused confusion.  The example of mortgage broker fees is amended to
simply reflect the general rule that a fee is a finance charge if the creditor retains
the fee.

  With regard to taxes, some commenters noted that the commentary addresses in several
areas the issue of whether taxes are finance charges. These commenters requested that
all comments referring to taxes be consolidated into one comment.  To ease compliance,
the reference to taxes currently contained in comment 4(a)-3 is removed.  The general
rules on the treatment of taxes under the TILA are contained in renumbered and revised
comment 4(a)-7, formerly comment 4(a)-6.  The current reference to taxes under 4(e)-1
has been revised and the current reference to taxes under 4(a)-1 remains unaffected.

*4(c)  Charges Excluded From the Finance Charge*

*Paragraph 4(c)(7)*

  Comment 4(c)(7)-1 clarifies certain real-estate and residential mortgage *16773
transaction costs that are excluded from the finance charge.  In response to commenters'
suggestions and upon further analysis, the comment is revised to state that fees
excludable under this section include not only the cost of the charges excludable under
this section, but also the cost of verifying or confirming information relating to
excludable item itself.  The previous language specifically stated that a credit report
fee included the cost of verifying information in the report.  This language was intended
to be read only as an example.  It is now more clearly shown as such.  Verification or
confirmation fees, like other excludable charges under this section, must be bona fide
and reasonable in amount.

  The language addressing lump sum charges has been moved to a new comment, 4(c)(7)-2.
This provision has been adopted as proposed, with some revisions for clarity.  The comment
states that a lump sum charge for conducting or attending a closing (charged, for example,
by a lawyer or a title company) is excluded from the finance charge if the charge is
primarily for services related to items listed in § 226.4(c)(7) (such as reviewing or
completing documents), even if other incidental services, such as explaining various
documents or disbursing funds for the parties, are performed.  This is an exception to
the general rule on the treatment of lump sum fees. Most commenters supported the proposal
as a clarification of the Board's existing position.  Several, however, opposed allowing
creditors to exclude fees for incidental services where the charge is primarily for
services related to items listed in § 226.4(c)(7), believing that this would result in
less accurate disclosures.

  Comment 4(c)(7)-3 (proposed as 4(c)(7)-2) has been adopted as proposed, with minor
changes for clarity.  The comment states that charges excludable under §  226.4(c)(7)
are those imposed in connection with the initial decision to grant credit--for example,
a fee to search for tax liens on the property or to determine if flood insurance is
required.  The comment also clarifies that fees for services to be performed during the
loan term, for example, to monitor a consumer's continued compliance with contract
provisions, such as paying property taxes or purchasing flood insurance, are not
excludable under §  226.4(c)(7), regardless of when they are paid. These recurring
administrative fees, paid by the consumer to protect the creditor's security interest,
are finance charges.

  Commenters generally agreed with the proposed language.  Many, however, had concerns
regarding the treatment of fees paid at closing for services attributable both to the
initial credit decision and to services to be performed periodically over the term of
the loan.  For example, certain flood certification providers charge a consolidated fee,
and it may not be clear to creditors what portion of the fee relates to the services
connected with the initial credit decision.  The final commentary addresses these
concerns by specifying that a creditor may treat the entire charge as a finance charge
if the creditor is uncertain of the portion properly attributable to the finance charge.
Such sum need not be labelled as an estimate.

*4(e)  Certain Security Interest Charges*

  Comment 4(e)-1 provides examples of security interest charges that are and are not

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

excludable as finance charges.  The proposal stated that only recording fees relating
to the obligation between the creditor and the consumer were excludable.  Most commenters
supported the proposal, although some were opposed.  The comment is adopted as proposed,
but indicates that fees to record documents such as an assignment between a creditor and
a third party are finance charges.

   In response to comments and for clarity, the portion of comment 4(e)-1 dealing with taxes
has been revised.  As discussed above, comment 4(a)-7 (formerly 4(a)-6) contains the
general rules on the treatment of taxes.

*Subpart B--Open-End Credit*

Section 226.5--General Disclosure Requirements

*5(b)  Time of Disclosures*

*5(b)(1)  Initial Disclosures*

   Comment 5(b)(1)-1 provides that initial disclosures must be provided before the consumer
makes the first purchase under an open-end plan.  The comment provides an example to
illustrate that when a consumer makes a purchase and opens an account with a retailer
contemporaneously, initial disclosures must be given to the consumer at that time.

   Comment 5(b)(1)-5 addresses the general rule as it relates to the timing of initial
disclosures when a creditor offers consumers an option to transfer outstanding balances
with other creditors as part of a preapproval or general solicitation of an open-end credit
plan.  The proposal required creditors to comply with initial disclosure requirements
under § 226.6 before the consumer authorized the balance transfer.  The purpose of the
proposal was to ensure that consumers receive initial disclosures before the first
transaction is made under the plan.

   Commenters were divided on the proposal.  Several commenters believed that the
disclosures required under § 226.5a at the time of solicitation adequately protect and
sufficiently inform the consumer about the terms of the credit plan.  The initial
disclosures required under § 226.6, however, contain important terms that are not included
in the solicitation disclosures.  For example, the initial disclosures give the cash
advance APR, information that could be an important factor in a consumer's decision to
authorize a balance transfer.  To ease compliance, card issuers that are subject to the
requirements of § 226.5a may establish procedures that comply with both sections in a
single disclosure statement.  Comment 5a-2 provides guidance on the appropriate format
for combined disclosures.  For example, a creditor could provide the § 226.5a disclosures
in a tabular format, along with the additional disclosures required by § 226.6 outside
the table.

   Other commenters requested an "opt-out" provision that would allow card issuers to comply
by establishing a procedure under which a consumer could cancel or reverse the balance
transfer after receiving initial disclosures. This option raises concerns about the
effect such an approach would have on a consumer whose balance with a third party would
be paid by the card issuer.  It could be difficult to cancel or reverse the balance
transfer transaction.

   Commenters suggested that a creditor could comply with the initial disclosure
requirements under § 226.6 by delaying the requested transfer for a period of time after
the initial disclosures are sent.  The delay would ensure that the initial disclosures
are received by the consumer before the transferred balance is applied to the new plan.
Under the revised commentary, a creditor complies with this section if initial disclosures
required under § 226.6 are furnished before a balance transfer transaction occurs.

Section 226.6--Initial Disclosure Statement

*6(b)  Other Charges*

   Comment 6(b)-1 provides guidance for disclosing a termination fee imposed in an open-end
credit plan, as proposed.  Commenters generally supported the disclosure of a termination

fee as an "other charge." Some commenters believed disclosing the fee as a finance charge
might better assist consumers in shopping for a credit plan.  But this approach would
not facilitate consumer *16774 shopping based on the APR, since the APR in the initial
disclosures reflects on finance charges based on periodic rates, and thus would not be
affected by a termination fee.  Furthermore, the consumer would gain little from
receiving an APR (disproportionately high in some cases) on what might be the last periodic
statement for a fee imposed when the consumer closes the plan.

Section 226.12--Special Credit Card Rules

*12(b) Liability of Cardholder for Unauthorized Use*

  Comments 12(b)-2 and -3 address a card issuer's rights and responsibilities in responding
to a claim of unauthorized use under § 226.12.  Comment 12(b)-2 clarifies that a card
issuer is not required to impose any liability.  Comment 12(b)-3 clarifies that a card
issuer wishing to impose liability must investigate claims in a reasonable manner.

  Comment 12(b)-3 lists some of the procedures that may be involved in the investigation
of a claim.  The procedures involved in conducting a reasonable investigation depend on
the facts of the situation; neither a minimum nor a maximum number of steps is required
to deem a particular investigation "reasonable." Some commenters expressed concern about
card issuers advising consumers that they may be required to appear in a court action.
These commenters believed such statements would possibly be misleading and intimidating,
and that in any case a court action was independent of a card issuer's investigation.
The reference to court appearances has been deleted.

  Commenters suggested a variety of other actions that a card issuer may take, in addition
to those proposed, in a reasonable investigation of a claim of unauthorized use.  The
list has been expanded to clarify that a card issuer may request documentation to verify
the claim and may request information regarding the cardholder's knowledge of the person
who allegedly used the card or of that person's authority to do so.

  Many commenters expressed concern that the proposed comment prohibited a card issuer
from denying a claim because a cardholder refused to comply with any request for
cooperation, such as the failure to submit a signed statement. A card issuer may not
automatically deny a claim based solely on the cardholder's failure or refusal to comply
with a particular request.  For example, a cardholder may return an unsigned
questionnaire about the claim but may refuse to submit a sworn statement.  The card issuer
may not automatically deny the claim because it is unaccompanied by an affidavit.
However, the comment also makes clear that the cardholder's failure to cooperate may
affect the card issuer's ability to investigate the claim of unauthorized use.  For
example, if the cardholder fails to respond to requests for information the card issuer can
reasonably obtain only from the cardholder, the comment provides that the card issuer,
without further information, may reasonably terminate its investigation.

Section 226.15--Right of Rescission

*15(a) Consumer's Right To Rescind*

*Paragraph 15(a)(1)*

  Comments 15(a)(1)-5 and -6 are revised to provide further guidance on the right to rescind
a transaction secured by a consumer's principal dwelling. (See also comments 23(a)(1)-3
and -4.)

*15(d) Effects of Rescission*

  Comment 15(d)(2)-1 is revised to clarify that if a consumer rescinds a credit
transaction, the creditor must refund any broker fee that is part of the credit
transaction, even though the consumer paid the fee to the broker rather than to the
creditor.  (See comment 23(d)(2)-1.)

Section 226.16--Advertising

                    ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                    Page 6
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

*16(d) Additional Requirements for Home Equity Plans*

   Comment 16(d)-7 clarifies disclosure requirements for balloon payments in home equity
plan advertisements.  The commentary to § 226.5b(d)(5)(ii) provides that for plans in
which a balloon payment will occur if the consumer makes only the minimum payments, the
disclosure must state that fact.  A comparable requirement applies to advertisements,
since the regulatory provisions on treatment of balloon payments in home equity
advertising and in disclosures are generally parallel.

   A number of commenters thought the proposed comment would require a disclosure about
balloon payments in any advertisement for a program in which a balloon payment occurs,
regardless of whether the advertisement included a "trigger term." The proposed comment
was not intended to impose such a requirement.  The comment has been revised to clarify
that disclosure is required only if the advertisement contains a statement about a minimum
periodic payment.  The comment also addresses questions about the required content of
the disclosure, including concerns about the effect of the cross-reference to comment
5b(d)(5)(ii)-3.

*Subpart C--Closed-End Credit*

Section 226.17--General Disclosures

*17(a) Form of Disclosures*

*Paragraph 17(a)(1)*

   Comment 17(a)(1)-5 is revised to clarify that a late payment fee on a single payment
loan is information directly related to the segregated disclosures.  The introductory
language has been revised to clarify that the list of directly related information is
exhaustive.

*17(c) Basis of Disclosures and Use of Estimates*

*Paragraph 17(c)(4)*

   Section 226.17(c)(4) allows creditors to disregard in the payment schedule and other
calculations any small variations in the first payment due to a long or short first period.
Comment 17(c)(4)-4 clarifies that prepaid finance charges, such as "odd-days" or
"per-diem" interest paid at or prior to closing, may not be considered as the first payment
on a loan.  Thus, "odd-days" interest paid at or prior to closing cannot be considered
a part of the payment schedule and disregarded as a irregularity in disclosing the finance
charges in the payment schedule.  The language has been adopted as proposed, with a minor
change made to state that the comment applies to "pre-paid" and "odd-days" interest, using
those terms by name.

   Commenters favored treating odd-days or per-diem interest collected at closing as being
the first payment for the purposes of these "minor irregularities" provisions when the
consummation date is subject to change outside of the lender's control (for example, in
some escrow-closing states).  If interest collected at, or prior to, consummation meets
the definition of a prepaid finance charge, it must be treated as such.

   The regulation does not require creditors to collect odd-days or per-diem interest at,
or prior to, consummation.  If that interest is collected as part of the first periodic
payment, instead, the minor irregularities provisions of § 226.17(c)(4) would apply to
the extent the amount is within those parameters.

*17(f) Early Disclosures*

   Comment 226.17(f)-1 is revised to clarify that the regulation requires redisclosure not
only if the APR, at consummation, differs from the earlier disclosed APR by more than
the allowable 1/8 or 1/4 of 1 percent *16775 tolerance, but also if the early disclosures
were not marked as estimates, and the terms at consummation, other than the APR, differ
from the earlier disclosed terms.  Language has been added to the second example to
illustrate the case when terms at consummation differ from those previously disclosed,

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 7
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

where they were not marked as estimates.  To facilitate comparison of the two examples,
the dates in the second example have been changed to those stated in the first example.
A third example has been added to illustrate circumstances when the regulation does not
require redisclosure even though the consummated terms, including the APR, differ from
the disclosed terms.

Section 226.18--Content of Disclosures

*18(c) Itemization of Amount Financed*

*Paragraph 18(c)(1)(iv)*

   Comment 18(c)(1)(iv)-2 clarifies disclosure requirements under the TILA that are
affected by new aggregate accounting rules under the Real Estate Settlement Procedures
Act (RESPA; 12 U.S.C. 2601). The comment provides that creditors may use the amount on
line 1002 of the HUD-1 or HUD-1A, without adjustment, to calculate the prepaid finance
charge under the TILA.

   In October 1994, the Department of Housing and Urban Development (HUD), which implements
Real Estate Settlement Procedures Act (RESPA; 12 U.S.C. 2601) through Regulation X (24
CFR Part 3500), amended its regulation to implement new procedures for calculating the
amount consumers must pay into escrow accounts associated with RESPA-covered home
mortgage loans (59 FR 53890, October 26, 1994, and 60 FR 8812, February 15, 1995).  These
procedures are being phased in over time for existing escrow accounts; all new escrow
accounts established on or after April 24, 1995, must comply with the new procedures.
Eventually, all lenders will be required to use an aggregate accounting method instead
of a single-item method for RESPA transactions.  The use of the aggregate method will
affect disclosure requirements under Regulation Z.

   Currently, in calculating the amounts required to be paid into escrow accounts at
closing, most lenders use what is referred to as the single-item analysis. (Property
taxes, insurance, and mortgage insurance premiums are common examples of escrow items.)
Under single-item analysis, lenders account separately for each item to be collected at
closing and held in escrow.

   Under the aggregate accounting method, rather than accounting for each item separately,
the amount for escrow is determined as a whole.  This will make it difficult for a creditor
to determine how much of the aggregate amount is actually allocated to each escrow item.

   Regardless of how they collect the funds under RESPA, lenders will continue to disclose
escrow items on the HUD settlement statement using the single-item analysis.  If the
amount actually collected at settlement is affected by the aggregate accounting method,
the settlement statement will reflect the adjustment on a separate line in the 1000 series
(§ 3500.8(c)(1), 60 FR 8816, February 15, 1995).  Mortgage insurance premiums, one of
the items typically paid at settlement and included in the escrow account, are listed
on line 1002 of the HUD statement.  This amount is also a prepaid finance charge under
Regulation Z.

   If a creditor is collecting the settlement charges using aggregate analysis the amount
actually collected may be less than the amount listed on line 1002. Guidance had been
requested on what amount lenders should use as the prepaid finance charge, since the amount
disclosed is not precisely the amount collected.  Various alternatives were considered
to ensure as accurate and uniform a disclosure as possible.  Comment 18(c)(1)(iv)-2
provides that creditors may use the amount on line 1002, without adjustment, to calculate
the prepaid finance charge under the TILA.  This approach will ease compliance and provide
consumers with an easily identifiable amount for the mortgage insurance.  While this
method does slightly overstate the amount of the prepaid finance charge for mortgage
insurance, nonetheless this method seems to provide the more accurate and equitable
treatment possible given the problems associated with identifying the amount of any single
item in an aggregate accounting analysis.

   Commenters generally supported this approach.  Several commenters requested further
clarification on whether the approach is mandatory, whether the figure used is considered
an estimate, and how the tolerance is applied in this situation.  A sentence has been

                 ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                              Page 8
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

added to the comment to clarify that the Board is deeming the figure used on the HUD-1 or HUD-1A as accurate, for purposes of Regulation Z, as long as that amount is computed in accordance with RESPA. Accordingly, the figure is not considered an estimate, and the tolerance would apply as it does for all other figures disclosed under Regulation Z. As long as the figure disclosed is accurate for purposes of RESPA, the figure is accurate to determine the finance charge tolerance.   The approach is mandatory for all loans closed using the aggregate accounting method required by RESPA.

*18(d)  Finance Charge*

   Comment 18(d)-2 has been adopted as proposed, with some minor revisions for clarity. The comment states that although there is no specific tolerance for the amount financed, an error in that figure--resulting from an error in the finance charge--does not violate the act or the regulation provided the finance charge disclosed under § 226.18(d) is within the permissible tolerance provided in footnote 41 of the regulation.   This same interpretation applies to other disclosures for which the regulation provides no specific tolerance, such as the total of payments.

   Most commenters were in favor of the proposal.   Views were split among those commenters opposing the proposal.   Some suggested that a maximum tolerance of $10 was insufficient to adequately protect lenders.   Several others opposed any tolerance for errors in the amount financed or the other disclosures that was not currently addressed in the regulation.

   Several commenters pointed out that the language suggested the error must result from an error in the finance charge "that constitutes a part of the amount financed." This phrase has been deleted as unnecessary.

Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions

*19(b)  Certain Variable-Rate Transactions*

*Paragraph 19(b)(2)(vii)*

   Comment 19(b)(2)(vii)-2, with the exception of a few technical changes, is adopted as proposed.   It states that loans with more than one way to trigger negative amortization are separate variable-rate loan programs requiring separate disclosures to the extent they vary from each other.   For example, a loan which provides for monthly interest rate changes but only annual payment changes and an option for the borrower to cap the amount of monthly payments whenever the new payment would exceed the old payment by more than a certain margin, contains two separate variable-rate programs.   Each program may trigger negative amortization requiring separate disclosures.   (See comments 226.19(b)(2)-2 and -3 for a discussion on the definition of a variable-rate program and consolidation of disclosures for more than one program.) **\*16776** For the program that gives the borrower an option to cap monthly payments, the creditor must fully disclose the rules relating to the payment cap option, including the effects of exercising it (such as negative amortization occurs and that the principal balance will increase), except that the disclosure in § 226.19(b)(2)(viii) need not be given for the option.

Section 226.22--Determination of the Annual Percentage Rate

*22(a)  Accuracy of the Annual Percentage Rate*

*Paragraph 22(a)(1)*

   Comment 22(a)(1)-5 corrects an erroneous footnote reference.

Section 226.23--Right of Rescission

*23(a)  Consumer's Right To Rescind*

*Paragraph 23(a)(1)*

   Comment 23(a)(1)-4, which contains an exception to the "one principal dwelling" rule

                    ©   2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                        Page 9
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

in comment 23(a)(1)-3, is revised.  Under the exception, a consumer may have, in effect, two principal dwellings for a time.  Even if a consumer is acquiring or constructing a new principal dwelling, any loan subject to Regulation Z may be rescinded when the consumer's current principal dwelling secures the loan.  A typical example is a bridge loan.

  The proposed comment provided, by example, that a loan secured by the new home and the current home is a residential mortgage transaction.  While many commenters agreed with the proposal, some viewed it as a change in the existing interpretation.  Upon further analysis, the proposed example would negate the exception to the general rule.  The existing language of comment 23(a)(1)-4 has been retained with language and examples added for clarification.  Accordingly, even if a loan is a purchase-money loan secured by the new home (that is, a residential mortgage transaction) where that loan also is secured by the consumer's current home, the loan is rescindable.

*23(d)  Effects of Rescission*

*Paragraph 23(d)(2)*

  Comment 23(d)(2)-1 has been revised to clarify that if a consumer rescinds a credit transaction, the creditor must refund to the consumer any broker fee that is part of the credit transaction, even though the consumer paid the fee to the broker rather than to the creditor.  Several commenters expressed concern that the literal language of the comment could be construed to encompass a fee paid to a broker who did not participate in the credit transaction.  Some commenters wanted broker fees covered only to the extent that the lender required the use of a broker.  Creditors must refund to the consumer any broker's fee paid as part of the credit transaction, whether or not the creditor required the use of a broker.

*(23)(f)  Exempt Transactions*

*Paragraph (23)(f)(4)*

  Comment 23(f)-4 clarifies that § 226.23(f)(2) exempts from the right of rescission refinancings by original creditors--to whom a written agreement was originally payable.  Therefore, if a consumer refinances with any other creditor, the general rescission model form (model form H-8) is the appropriate form to provide to the consumer.

  Several commenters opposed the proposal, which they believe would result in an anomaly.  That is, if the original creditor assigns the mortgage to a third party and the consumer returns to the original creditor to refinance (with no new advances), the original creditor would be excused from providing the consumer with the right of rescission.

  In certain circumstances the application of this rule may produce an anomalous result.  Nevertheless, this interpretation is required by section 103(f) of the act and § 226.2(a)(17) of the regulation, which define "creditor" as "* * * the person to whom the debt arising from the consumer credit transaction is initially payable.* * *".

  The comment also clarifies that in a merger, consolidation or acquisition, the acquiring creditor would be considered the original creditor for purposes of the exemption in § 226.23(f)(2).  For example, if two lending institutions merge, the resulting institution is considered the original creditor for refinancing mortgages previously originated by either of the two institutions.  Accordingly, the new institution may use model form H-9 if new money is advanced.  (See comment 2(a)(25)-6.)

Appendix J--Annual Percentage Rate Computations for Closed-End Credit Transactions

  As proposed, the Board has revised the 1981 changes paragraph in the reference section to make a technical correction to the second sentence.

List of Subjects in 12 CFR Part 226

  Advertising, Banks, banking, Consumer protection, Credit, Federal Reserve System, Mortgages, Reporting and recordkeeping requirements, Truth in lending.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 10
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

For the reasons set forth in the preamble, the Board amends 12 CFR part 226 as follows:

PART 226--TRUTH IN LENDING (REGULATION Z)

1. The authority citation for part 226 continues to read as follows:

Authority: <u>12 U.S.C. 3806</u>; <u>15 U.S.C. 1604</u> and <u>1637(c)(5)</u>.

<u>12 CFR § 226.2</u>

2. In Supplement I to Part 226, under <u>Section 226.2</u>--Definitions and Rules of Construction, under Paragraph 2(a)(17)(i)., paragraph 8. is revised to read as follows:

Supplement I--Official Staff Interpretations

* * * * *

Subpart A--General

* * * * *

*Section 226.2--Definitions and Rules of Construction*

* * * * *
 Paragraph 2(a)(17)(i).

* * * * *
 8. Loans from employee savings plan. Some employee savings plans permit participants to borrow money up to a certain percentage of their account balances, and use a trust to administer the receipt and disbursement of funds. Unless each participant's account is an individual plan and trust, the creditor should apply the numerical tests to the plan as a whole rather than to the individual account, even if the loan amount is determined by reference to the balance in the individual account and the repayments are credited to the individual account.  The person to whom the obligation is originally made payable (whether the plan, the trust, or the trustee) is the creditor for purposes of the act and regulation.

* * * * *
 3. In Supplement I to Part 226, under Section 226.4--Finance Charge, the following amendments are made:

 a. Under 4(a) Definition., paragraphs 1., and 3. are revised, paragraphs 4., 5., and 6 are redesignated as paragraphs 5., 6., and 7., a new paragraph 4. is added, and newly designated paragraph 7. is revised;

 b. Under Paragraph 4(c)(7)., paragraph 1. is revised and new paragraphs 2. and 3. are added; and

 c. Under (4)(e) Certain security interest charges., paragraph 1. is revised.

 The revisions and additions read as follows:

* * * * *

*Section 226.4--Finance Charge*

 4(a) Definition.

 1. Charges in comparable cash transactions.  Charges imposed uniformly in cash and credit transactions are not finance charges. In determining whether an item is a *16777 finance charge, the creditor should compare the credit transaction in question with a similar cash transaction.  A creditor financing the sale of property or services may

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compare charges with those payable in a similar cash transaction by the seller of the property or service.

   i.  For example, the following items are not finance charges:

   A.  Taxes, license fees, or registration fees paid by both cash and credit customers.

   B.  Discounts that are available to cash and credit customers, such as quantity discounts.

   C.  Discounts available to a particular group of consumers because they meet certain criteria, such as being members of an organization or having accounts at a particular financial institution.  This is the case even if an individual must pay cash to obtain the discount, provided that credit customers who are members of the group and do not qualify for the discount pay no more than the nonmember cash customers.

   D.  Charges for a service policy, auto club membership, or policy of insurance against latent defects offered to or required of both cash and credit customers for the same price.

   ii. In contrast, the following items are finance charges:

   A.  Inspection and handling fees for the staged disbursement of construction loan proceeds.

   B.  Fees for preparing a Truth in Lending disclosure statement, if permitted by law (for example, the Real Estate Settlement Procedures Act prohibits such charges in certain transactions secured by real property).

   C.  Charges for a required maintenance or service contract imposed only in a credit transaction.

   iii. If the charge in a credit transaction exceeds the charge imposed in a comparable cash transaction, only the difference is a finance charge.  For example:

   A.  If an escrow agent is used in both cash and credit sales of real estate and the agent's charge is $100 in a cash transaction and $150 in a credit transaction, only $50 is a finance charge.

   2.  Costs of doing business.  * * *

   3.  Charges by third parties.  Charges imposed on the consumer by someone other than the creditor are finance charges (unless otherwise excluded) if the creditor requires the use of a third party as a condition of or incident to the extension of credit, even if the consumer can choose the third party, or the creditor retains the charge.  For example:

   i.  The cost of required mortgage insurance, even if the consumer is allowed to choose the insurer.

   ii. A mortgage broker fee, to the extent that the broker shares the fee with the creditor.

   4.  Charges by settlement agents.  Charges imposed on the consumer by a settlement agent (such as an attorney, escrow agent, or title company) are finance charges only if the creditor requires the particular services for which the settlement agent is charging the borrower and the charge for those services is not otherwise excluded from the finance charge.  For example, a fee for courier service charged by a settlement agent to send a document to the title company or some other party is not a finance charge, provided that the creditor has not required the use of a courier or retained the charge.

   5.  Forfeitures of interest. * * *

   6.  Treatment of fees for use of automated teller machines. * * *

   7.  Taxes.  i. Generally, a tax imposed by a state or other governmental body solely

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on a creditor is a finance charge if the creditor separately imposes the charge on the
consumer.

   ii.  In contrast, a tax is not a finance charge (even if the tax is collected by the
creditor) if applicable law imposes the tax:

   A.   Solely on the consumer;

   B.   On the creditor and the consumer jointly;

   C.   On the credit transaction, without indicating which party is liable for the tax;
or

   D.   On the creditor, if applicable law directs or authorizes the creditor to pass the
tax on to the consumer.  (For purposes of this section, if applicable law is silent as
to passing on the tax, the law is deemed not to authorize passing it on.)

   iii.  For example, a stamp tax, property tax, intangible tax, or any other state or local
tax imposed on the consumer, or on the credit transaction, is not a finance charge even
if the tax is collected by the creditor.

   iv.  In addition, a tax is not a finance charge if it is excluded from the finance charge
by an other provision of the regulation or commentary (for example, if the tax is imposed
uniformly in cash and credit transactions).

* * * * *
 Paragraph 4(c)(7).

   1.  Real estate or residential mortgage transaction charges.  The list of charges in
§ 226.4(c)(7) applies both to residential mortgage transactions (which may include, for
example, the purchase of a mobile home) and to other transactions secured by real estate.
The fees are excluded from the finance charge even if the services for which the fees
are imposed are performed by the creditor's employees rather than by a third party.  In
addition, the cost of verifying or confirming information connected to the item is also
excluded. For example, credit report fees cover not only the cost of the report, but also
the cost of verifying information in the report.  In all cases, charges excluded under
§ 226.4(c)(7) must be bona fide and reasonable.

   2.  Lump sum charges. If a lump sum charged for several services includes a charge that
is not excludable, a portion of the total should be allocated to that service and included
in the finance charge.  However, a lump sum charged for conducting or attending a closing
(for example, by a lawyer or a title company) is excluded from the finance charge if the
charge is primarily for services related to items listed in § 226.4(c)(7) (for example,
reviewing or completing documents), even if other incidental services such as explaining
various documents or disbursing funds for the parties are performed.  The entire charge
is excluded even if a fee for the incidental services would be a finance charge if it
were imposed separately.

   3.  Charges assessed during the loan term.  Real estate or residential mortgage
transaction charges excluded under § 226.4(c)(7) are those charges imposed solely in
connection with the initial decision to grant credit.  This would include, for example,
a fee to search for tax liens on the property or to determine if flood insurance is
required.  The exclusion does not apply to fees for services to be performed periodically
during the loan term, regardless of when the fee is collected.  For example, a fee for
one or more determinations during the loan term of the current tax lien status or flood
insurance requirements is a finance charge, regardless of whether the fee is imposed at
closing, or when the service is performed.  If a creditor is uncertain about what portion
of a fee to be paid at consummation or loan closing is related to the initial decision
to grant credit, the entire fee may be treated as a finance charge.

* * * * *
 (4)(e) Certain security interest charges.

   1.  Examples.

                 ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                        Page 13
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

i.  Excludable charges.  Sums must be actually paid to public officials to be excluded from the finance charge under § 226.4(e)(1).  Examples are charges or other fees required for filing or recording security agreements, mortgages, continuation statements, termination statements, and similar documents, and intangible property or other taxes imposed by the state solely on the creditor and payable by the consumer (if the tax must be paid to record a security agreement).

ii.  Charges not excludable.  If the obligation is between the creditor and a third party (an assignee, for example), charges or other fees for filing or recording security agreements, mortgages, continuation statements, termination statements, and similar documents relating to that obligation are not excludable from the finance charge under this section.

* * * * *
4.  In Supplement I to Part 226, under Section 226.5--General Disclosure Requirements, under 5(b)(1) Initial disclosures., in paragraph 1., the first and second sentences are revised, and a new paragraph 5. is added to read as follows:

* * * * *

Subpart B--Open-End Credit

*Section 226.5--General Disclosure Requirements*

* * * * *
5(b)(1) Initial disclosures.

1.  Disclosure before the first transaction.  The rule that the initial disclosure statement must be furnished "before the first transaction" requires delivery of the initial disclosure statement before the consumer becomes obligated on the plan.  For example, the initial disclosures must be given before the consumer makes the first purchase (such as when a consumer opens a credit plan and makes purchases contemporaneously at a retail store), receives the first advance, or pays any fees or charges under the plan other than an application fee or refundable membership fee (see below).* * *

* * * * *
**\*16778** 5.  Balance transfers. A creditor that solicits the transfer by a consumer of outstanding balances from an existing account to a new open-end plan must comply with § 226.6 before the balance transfer occurs.  Card issuers that are subject to the requirements of § 226.5a may establish procedures that comply with both sections in a single disclosure statement.

* * * * *
5.  In Supplement I to Part 226, under Section 226.6--Initial Disclosure Statement, under 6(b) Other charges., paragraph 1. is revised to read as follows:

* * * * *

*Section 226.6--Initial Disclosure Statement*

* * * * *
6(b) Other charges.

1.  General; examples of other charges.  Under § 226.6(b), significant charges related to the plan (that are not finance charges) must also be disclosed.  For example:

i.  Late payment and over-the-credit-limit charges.

ii. Fees for providing documentary evidence of transactions requested under §  226.13 (billing error resolution).

iii. Charges imposed in connection with real estate transactions such as title,

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                              Page 14
60 FR 16771-01, 1995 WL 139019 (F.R.)
(Cite as: 60 FR 16771)

appraisal, and credit report fees (see § 226.4(c)(7)).

iv. A tax imposed on the credit transaction by a state or other governmental body, such as a documentary stamp tax on cash advances (see the commentary to § 226.4(a)).

v.   A membership or participation fee for a package of services that includes an open-end credit feature, unless the fee is required whether or not the open-end credit feature is included.  For example, a membership fee to join a credit union is not an "other charge," even if membership is required to apply for credit.

vi. Automated teller machine (ATM) charges described in comment 4(a)-5 that are not finance charges.

vii. Charges imposed for the termination of an open-end credit plan.

* * * * *
6.  In Supplement I to Part 226, under Section 226.12--Special Credit Card Provisions, under 12(b) Liability of cardholder for unauthorized use., new paragraphs 2. and 3. are added to read as follows:

* * * * *

*Section 226.12--Special Credit Card Provisions*

* * * * *
12(b) Liability of cardholder for unauthorized use.

* * * * *
2.   Imposing liability.  A card issuer is not required to impose liability on a cardholder for the unauthorized use of a credit card; if the card issuer does not seek to impose liability, the issuer need not conduct any investigation of the cardholder's claim.

3.   Reasonable investigation.  If a card issuer seeks to impose liability when a claim of unauthorized use is made by a cardholder, the card issuer must conduct a reasonable investigation of the claim.  In conducting its investigation, the card issuer may reasonably request the cardholder's cooperation.  The card issuer may not automatically deny a claim based solely on the cardholder's failure or refusal to comply with a particular request; however, if the card issuer otherwise has no knowledge of facts confirming the unauthorized use, the lack of information resulting from the cardholder's failure or refusal to comply with a particular request may lead the card issuer reasonably to terminate the investigation. The procedures involved in investigating claims may differ, but actions such as the following represent steps that a card issuer may take, as appropriate, in conducting a reasonable investigation:

i.  Reviewing the types or amounts of purchases made in relation to the cardholder's previous purchasing pattern.

ii. Reviewing where the purchases were delivered in relation to the cardholder's residence or place of business.

iii. Reviewing where the purchases were made in relation to where the cardholder resides or has normally shopped.

iv. Comparing any signature on credit slips for the purchases to the signature of the cardholder or an authorized user in the card issuer's records, including other credit slips.

v.  Requesting documentation to assist in the verification of the claim.

vi. Requesting a written, signed statement from the cardholder or authorized user.

vii. Requesting a copy of a police report, if one was filed.

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                      Page 15
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

viii.  Requesting information regarding the cardholder's knowledge of the person who allegedly used the card or of that person's authority to do so.

* * * * *
7.  In Supplement I to Part 226, under Section 226.15 --Right of Rescission, the following amendments are made:

a.  Under Paragraph 15(a)(1)., paragraph 5. is revised;

b.  Under Paragraph 15(a)(1)., paragraph 6. is revised; and

c.  Under Paragraph 15(d)(2)., in paragraph 1., the third sentence is revised.

The additions and revisions read as follows:

* * * * *

*Section 226.15--Right of Rescission*

* * * * *
Paragraph 15(a)(1).

* * * * *
5.  Principal dwelling.  A consumer can only have one principal dwelling at a time. (But see comment 15(a)(1)-6.) A vacation or other second home would not be a principal dwelling.  A transaction secured by a second home (such as a vacation home) that is not currently being used as the consumer's principal dwelling is not rescindable, even if the consumer intends to reside there in the future.  When a consumer buys or builds a new dwelling that will become the consumer's principal dwelling within one year or upon completion of construction, the new dwelling is considered the principal dwelling if it secures the open-end credit line.  In that case, the transaction secured by the new dwelling is a residential mortgage transaction and is not rescindable.  For example, if a consumer whose principal dwelling is currently A builds B, to be occupied by the consumer upon completion of construction, an advance on an open-end line to finance B and secured by B is a residential mortgage transaction.  Dwelling, as defined in § 226.2, includes structures that are classified as personalty under state law.  For example, a transaction secured by a mobile home, trailer, or houseboat used as the consumer's principal dwelling may be rescindable.

6.  Special rule for principal dwelling.  Notwithstanding the general rule that consumers may have only one principal dwelling, when the consumer is acquiring or constructing a new principal dwelling, a credit plan or extension that is subject to Regulation Z and is secured by the equity in the consumer's current principal dwelling is subject to the right of rescission regardless of the purpose of that loan (for example, an advance to be used as a bridge loan).  For example, if a consumer whose principal dwelling is currently A builds B, to be occupied by the consumer upon completion of construction, a loan to finance B and secured by A is subject to the right of rescission. Moreover, a loan secured by both A and B is, likewise, rescindable.

* * * * *
Paragraph 15(d)(2).

1.  Refunds to consumer.  * * * "Any amount" includes finance charges already accrued, as well as other charges such as broker fees, application and commitment fees, or fees for a title search or appraisal, whether paid to the creditor, paid by the consumer directly to a third party, or passed on from the creditor to the third party.  * * *

* * * * *
8.  In Supplement I to Part 226, under Section 226.16--Advertising, under 16(d) Additional Requirements for Home Equity Plans, a new paragraph 7. is added to read as follows:

* * * * *

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                                Page 16
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

*Section 226.16--Advertising*

* * * * *
16(d) Additional Requirements for Home Equity Plans.

* * * * *
7.  Balloon payment. In some programs, a balloon payment will occur if only the minimum
payments under the plan are made.  If an advertisement for such a program contains any
statement about a minimum periodic payment, the advertisement must also state that a
balloon payment will result (not merely that a balloon payment "may" result).  (See
comment 5b(d)(5)(ii)-3 for guidance on items not required to be stated in the
advertisement, and on situations in which the balloon payment requirement does not apply.)

* * * * *
9.  In Supplement I to Part 226, under Section 226.17--General Disclosure **\*16779**
Requirements, the following amendments are made:

a.  Under Paragraph 17(a)(1)., paragraph 5. is revised;

b.  Under Paragraph 17(c)(4)., a new paragraph 4. is added; and

c.  Under 17(f) Early disclosures., paragraph 1. is revised.

The revisions and additions read as follows:

* * * * *

Subpart C--Closed-End Credit

*Section 226.17--General Disclosure Requirements*

* * * * *
Paragraph 17(a)(1).

* * * * *
5.  Directly related.  The segregated disclosures may, at the creditor's option,
include any information that is directly related to those disclosures. The following is
directly related information:

i.  A description of a grace period after which a late payment charge will be imposed.
For example, the disclosure given under § 226.18(l) may state that a late charge will
apply to "any payment received more than 15 days after the due date."

ii. A statement that the transaction is not secured.  For example, the creditor may add
a category labelled "unsecured" or "not secured" to the security interest disclosures
given under § 226.18(m).

iii. The basis for any estimates used in making disclosures.  For example, if the
maturity date of a loan depends solely on the occurrence of a future event, the creditor
may indicate that the disclosures assume that event will occur at a certain time.

iv. The conditions under which a demand feature may be exercised.  For example, in a
loan subject to demand after five years, the disclosures may state that the loan will
become payable on demand in five years.

v.  An explanation of the use of pronouns or other references to the parties to the
transaction.  For example, the disclosures may state, "'You' refers to the customer and
'we' refers to the creditor."

vi. Instructions to the creditor or its employees on the use of a multiple-purpose form.
For example, the disclosures may state, "Check box if applicable."

vii. A statement that the borrower may pay a minimum finance charge upon prepayment in
a simple-interest transaction.  For example, when state law prohibits penalties, but

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would allow a minimum finance charge in the event of prepayment, the creditor may make the § 226.18(k)(1) disclosure by stating, "You may be charged a minimum finance charge."

viii.  A brief reference to negative amortization in variable-rate transactions.  For example, in the variable-rate disclosure, the creditor may include a short statement such as "Unpaid interest will be added to principal." (See the commentary to § 226.18(f)(1)(iii).)

ix. A brief caption identifying the disclosures.  For example, the disclosures may bear a general title such as "Federal Truth in Lending Disclosures" or a descriptive title such as "Real Estate Loan Disclosures."

x.  A statement that a due-on-sale clause or other conditions on assumption are contained in the loan document.  For example, the disclosure given under § 226.18(q) may state, "Someone buying your home may, subject to conditions in the due-on-sale clause contained in the loan document, assume the remainder of the mortgage on the original terms."

xi. If a state or Federal law prohibits prepayment penalties and excludes the charging of interest after prepayment from coverage as a penalty, a statement that the borrower may have to pay interest for some period after prepayment in full.  The disclosure given under § 226.18(k) may state, for example, "If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month."

xii. More than one hypothetical example under § 226.18(f)(1)(iv) in transactions with more than one variable-rate feature.  For example, in a variable-rate transaction with an option permitting consumers to convert to a fixed-rate transaction, the disclosures may include an example illustrating the effects on the payment terms of an increase resulting from conversion in addition to the example illustrating an increase resulting from changes in the index.

xiii.  The disclosures set forth under § 226.18(f)(1) for variable-rate transactions subject to § 226.18(f)(2).

xiv. A statement whether or not a subsequent purchaser of the property securing an obligation may be permitted to assume the remaining obligation on its original terms.

xv. A late-payment fee disclosure under § 226.18(l) on a single payment loan.

* * * * *
Paragraph 17(c)(4).

* * * * *
4.  Relation to prepaid finance charges.  Prepaid finance charges, including "odd-days" or "per-diem" interest, paid prior to or at closing may not be treated as the first payment on a loan. Thus, creditors may not disregard an irregularity in disclosing such finance charges.

* * * * *
17(f) Early disclosures.

1.  Change in rate or other terms.  Redisclosure is required for changes that occur between the time disclosures are made and consummation if the annual percentage rate in the consummated transaction exceeds the limits prescribed in § 226.22(a) ( 1/8 of 1 percentage point in regular transactions and 1/4 of 1 percentage point in irregular transactions).  Redisclosure is also required, even if the annual percentage rate is within the permitted tolerance, if the disclosures were not based on estimates in accordance with § 226.17(c)(2) and labelled as such.  To illustrate:

i.  If disclosures are made in a regular transaction on July 1, the transaction is consummated on July 15, and the actual annual percentage rate varies by more than 1/8 of 1 percentage point from the disclosed annual percentage rate, the creditor must either redisclose the changed terms or furnish a complete set of new disclosures before consummation.  Redisclosure is required even if the disclosures made on July 1 are based on estimates and marked as such;

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                          Page 18
60 FR 16771-01, 1995 WL 139019 (F.R.)
(Cite as: 60 FR 16771)

ii. If disclosures are made on July 1, the transaction is consummated on July 15, and the finance charge increased by $35 but the disclosed annual percentage rate is within the permitted tolerance, the creditor must at least redisclose the changed terms that were not marked as estimates. (See § 226.18(d) and footnote 41 of this part); and

iii. If early disclosures are marked as estimates and the disclosed annual percentage rate is within tolerance at consummation, the creditor need not redisclose the changed terms (including the annual percentage rate).

* * * * *
10. In Supplement I to Part 226, under Section 226.18--Content of Disclosures, the following amendments are made:

a. Under Paragraph 18(c)(1)(iv)., a new paragraph 2. is added; and

b. Under 18(d) Finance charge., paragraph 2. is revised.

The additions and revisions read as follows:

* * * * *

*Section 226.18--Content of Disclosures*

* * * * *
Paragraph 18(c)(1)(iv).

* * * * *
2. Prepaid mortgage insurance premiums. RESPA requires creditors to give consumers a settlement statement disclosing the costs associated with mortgage loan transactions. Included on the settlement statement are mortgage insurance premiums collected at settlement, which are prepaid finance charges. In calculating the total amount of prepaid finance charges, creditors should use the amount for mortgage insurance listed on the line for mortgage insurance on the settlement statement (line 1002 on HUD-1 or HUD 1-A), without adjustment, even if the actual amount collected at settlement may vary because of RESPA's escrow accounting rules. Figures for mortgage insurance disclosed in conformance with RESPA shall be deemed to be accurate for purposes of Regulation Z.

18(d) Finance charge.

* * * * *
2. Tolerance. A tolerance for the finance charge is provided in footnote 41 of this part. When a miscalculation of the amount financed, or of some other numerical disclosure for which the regulation provides no specific tolerance, results from an error in a finance charge, the miscalculated amount financed or other numerical disclosure does not violate the act or the regulation if the finance charge disclosed under § 226.18(d) is within the permissible tolerance under footnote 41 of this part.

* * * * *
11. In Supplement I to Part 226, under Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions, under paragraph *16780 19(b)(2) (vii)., paragraph 2. is revised to read as follows:

*Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions*

* * * * *
Paragraph 19(b)(2)(vii).

* * * * *
2. Negative amortization and interest rate carryover. A creditor must disclose, where applicable, the possibility of negative amortization. For example, the disclosure might state, "If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount." Loans that provide for more than one way to trigger negative amortization are separate variable-rate programs requiring separate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                                Page 19
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

disclosures. (See the commentary to § 226.19(b)(2) for a discussion on the definition
of a variable-rate loan program and the format for disclosure.) If a consumer is given
the option to cap monthly payments that may result in negative amortization, the creditor
must fully disclose the rules relating to the option, including the effects of exercising
the option (such as negative amortization will occur and the principal loan balance will
increase); however, the disclosure in § 226.19(b)(2)(viii) need not be provided.

* * * * *
    12. In Supplement I to Part 226, under Section 226.22--Determination of the Annual
Percentage Rate, under Paragraph 22(a)(1)., in paragraph 5., the reference "Footnote 45a"
is revised to read "Footnote 45d".

    13. In Supplement I to Part 226, under Section 226.23--Right of Rescission, the following
amendments are made:

    a.  Under Paragraph 23(a)(1)., paragraph 3.is revised;

    b.  Under Paragraph 23(a)(1)., paragraph 4. is revised;

    c.  Under Paragraph 23(d)(2)., in paragraph 1., the third sentence is revised; and

    d.  Under 23(f) Exempt transactions., in paragraph 4., two new sentences are added
following the first sentence, and a new sentence is added at the end of the paragraph.

    The additions and revisions read as follows:

* * * * *

*Section 226.23--Right of Rescission*

* * * * *
    Paragraph 23(a)(1).

* * * * *
    3.  Principal dwelling.  A consumer can only have one principal dwelling at a time.
(But see comment 23(a)(1)-4.) A vacation or other second home would not be a principal
dwelling.  A transaction secured by a second home (such as a vacation home) that is not
currently being used as the consumer's principal dwelling is not rescindable, even if
the consumer intends to reside there in the future.  When a consumer buys or builds a
new dwelling that will become the consumer's principal dwelling within one year or upon
completion of construction, the new dwelling is considered the principal dwelling if it
secures the acquisition or construction loan.  In that case, the transaction secured by
the new dwelling is a residential mortgage transaction and is not rescindable.  For
example, if a consumer whose principal dwelling is currently A builds B, to be occupied
by the consumer upon completion of construction, a construction loan to finance B and
secured by B is a residential mortgage transaction.  Dwelling, as defined in § 226.2,
includes structures that are classified as personalty under state law.  For example, a
transaction secured by a mobile home, trailer, or houseboat used as the consumer's
principal dwelling may be rescindable.

    4.  Special rule for principal dwelling.  Notwithstanding the general rule that
consumers may have only one principal dwelling, when the consumer is acquiring or
constructing a new principal dwelling, any loan subject to Regulation Z and secured by
the equity in the consumer's current principal dwelling (for example, a bridge loan) is
subject to the right of rescission regardless of the purpose of that loan.  For example,
if a consumer whose principal dwelling is currently A builds B, to be occupied by the
consumer upon completion of construction, a construction loan to finance B and secured
by A is subject to the right of rescission.  A loan secured by both A and B is, likewise,
rescindable.

* * * * *
    Paragraph 23(d)(2).

    1.  Refunds to consumer.  * * * "Any amount" includes finance charges already accrued,

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 FR 16771-01                                                                Page 20
60 FR 16771-01, 1995 WL 139019 (F.R.)
**(Cite as: 60 FR 16771)**

as well as other charges, such as broker fees, application and commitment fees, or fees
for a title search or appraisal, whether paid to the creditor, paid directly to a third
party, or passed on from the creditor to the third party.  * * *

* * * * *
 23(f) Exempt transactions.

* * * * *
 4.  New advances. * * * The original creditor is the creditor to whom the written
agreement was initially made payable.  In a merger, consolidation or acquisition, the
successor institution is considered the original creditor for purposes of the exemption
in § 226.23(f)(2).  * * * The general rescission notice (model form H-8) is the appropriate
form for use by creditors not considered original creditors in refinancing transactions.

* * * * *
 14. In Supplement I to Part 226, under Appendix J, under the heading References, under
1981 changes:, the last sentence is revised to read as follows:

* * * * *

Appendix J--Annual Percentage Rate Computations for Closed-End Credit Transactions

* * * * *

References

* * * * *
 1981 changes: * * * Paragraph (b)(5)(vi) has been revised to permit creditors in
single-advance, single-payment transactions in which the term is less than a year and
is equal to a whole number of months, to use either the 12-month method or the 365-day
method to compute the number of unit-periods per year.

 By order of the Board of Governors of the Federal Reserve System, acting through the
Secretary of the Board under delegated authority, March 28, 1995.

William W. Wiles,

Secretary of the Board.

[FR Doc. 95-8071 Filed 3-31-95; 8:45 am]

BILLING CODE 6210-01-P

 60 FR 16771-01, 1995 WL 139019 (F.R.)

END OF DOCUMENT

®  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit No. 2**

Westlaw.

2003 WL 24040101 (O.T.S.)                                                    Page 1

2003 WL 24040101 (O.T.S.)

Office of Thrift Supervision (OTS)

[Letter]
**PREEMPTION**
OF NEW YORK PREDATORY LENDING LAW

P-2003-2

January 30, 2003

[* * *]

Dear [* * *]:

This responds to your recent letter on behalf of * * * ("Association"), a federal savings
association. In your letter, you ask the Office of Thrift Supervision ("OTS") to confirm
that federal law **preempts** the application to the Association of the recently enacted
New York Predatory Lending Law ("NY law").[FN1] We conclude that NY law provisions
purporting to regulate the terms of credit, loan-related fees, disclosure and
advertising, and mortgage origination, refinancing, and servicing are **preempted** by
federal law from applying to federal savings associations.[FN2]

**Background**

The NY law imposes requirements on "high-cost home loans," including such loans made
by federal savings associations.[FN3] High-cost home loans are subject to certain
requirements on the terms of credit, loan-related fees, disclosure and advertising, and
mortgage origination, refinancing, and servicing. Requirements concerning the terms of
credit and loan-related fees include prohibiting call provisions, balloon payments,
negative amortization, default interest rates, modification or deferral fees, and single
premium insurance financing, as well as limiting advance payments and the financing of
points and fees.[FN4] Requirements concerning disclosure and advertising include mandating
a disclosure at application concerning financial counseling, a pre-closing disclosure
which, among other things, warns about possible foreclosure and home loss in the event
of default and encourages shopping and credit counseling, and a legend on the mortgage
instrument identifying the loan as high-cost, as well as prohibiting the encouragement
of default.[FN5] Requirements concerning mortgage origination, refinancing, and servicing
include limiting the circumstances in which a refinancing may occur, prohibiting lending
without regard to repayment ability, prohibiting the payment of referral fees to mortgage
brokers, restricting payments to home improvement contractors from loan proceeds, and
mandating reporting of payment history to a consumer credit bureau.[FN6]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5. *Split buydowns.* In certain transactions, a third party (such as a seller) and a consumer both pay an amount to the creditor to reduce the interest rate. The creditor must include the portion paid by the consumer in the finance charge and disclose the corresponding multiple payment levels and composite annual percentage rate. The portion paid by the third party and the corresponding reduction in interest rate, however, should not be reflected in the **disclosures** unless the lower rate is reflected in the credit contract. (See the discussion on third-party and consumer buydown transactions elsewhere in the commentary to § 226.17(c).)

6. *Wrap-around financing.* Wrap-around transactions, usually loans, involve the creditor's wrapping the outstanding balance on an existing loan and advancing additional funds to the consumer. The pre-existing loan, which is wrapped, may be to the same consumer or to a different consumer. In either case, the consumer makes a single payment to the new creditor, who makes the payments on the pre-existing loan to the original creditor. Wrap-around loans or sales are considered new single-advance transactions, with an amount financed equaling the sum of the new funds advanced by the wrap creditor and the remaining principal owed to the original creditor on the pre-existing loan. In disclosing the itemization of the amount financed, the creditor may use a label such as "the amount that will be paid to creditor X" to describe the remaining principal balance on the pre-existing loan. This approach to Truth in Lending calculations has no effect on calculations required by other statutes, such as state usury laws.

7. *Wrap-around financing with balloon payments.* For wrap-around transactions involving a large final payment of the new funds before the maturity of the pre-existing loan, the amount financed is the sum of the new funds and the remaining principal on the pre-existing loan. The **disclosures** should be based on the shorter term of the wrap loan, with a large final payment of both the new funds and the total remaining principal on the pre-existing loan (although only the wrap loan will actually be paid off at that time).

8. *Basis of disclosures in variable-rate transactions.* The **disclosures** for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the **disclosures** only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the **disclosures** on the initial rate and should not assume that this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer buydown, or a discounted or premium rate, **disclosures** should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term. (See the commentary to § 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature.)

9. *Use of estimates in variable-rate transactions.* The variable-rate feature does not, by itself, make the **disclosures** estimates.

10. *Discounted and premium variable-rate transactions.* In some variable-rate transactions, creditors may set an initial interest rate that is not determined by the index or formula used to make later interest rate adjustments. Typically, this initial rate charged to consumers is lower than the rate would be if it were calculated using the index or formula. However, in some cases the initial rate may be higher. In a discounted transaction, for example, a creditor may calculate interest rates according to a formula using the six-month Treasury bill rate plus a 2 percent margin. If the Treasury bill rate at consummation is 10 percent, the creditor may forgo the 2 percent spread and charge only 10 percent for a limited time, instead of setting an initial rate of 12 percent.

i. When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the **disclosures** should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation. The rate at consummation need not be used if a contract provides for a delay in the implementation of changes in an index value. For example, if the contract specifies that rate changes are based on the index value in effect 45 days before the change date, creditors may use any index value in effect during the 45 day period before consummation in calculating a composite annual percentage rate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ii. The effect of the multiple rates must also be reflected in the calculation and **disclosure** of the finance charge, total of payments, and payment schedule.

iii. If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the **disclosures.**

iv. Because these transactions involve irregular payment amounts, an annual percentage rate tolerance of 1/4 of 1 percent applies, in accordance with § 226.22(a)(3).

v. Examples of discounted variable-rate transactions include:

A. A 30-year loan for $100,000 with no prepaid finance charges and rates determined by the Treasury bill rate plus 2 percent. Rate and payment adjustments are made annually. Although the Treasury bill rate at the time of consummation is 10 percent, the creditor sets the interest rate for one year at 9 percent, instead of 12 percent according to the formula. The **disclosures** should reflect a composite annual percentage rate of 11.63 percent based on 9 percent for one year and 12 percent for 29 years. Reflecting those two rate levels, the payment schedule should show 12 payments of $804.62 and 348 payments of $1,025.31. The finance charge should be $266,463.32 and the total of payments $366,463.32.

B. Same loan as above, except with a 2 percent rate cap on periodic adjustments. The **disclosures** should reflect a composite annual percentage rate of 11.53 percent based on 9 percent for the first year, 11 percent for the second year, and 12 percent for the remaining 28 years. Reflecting those three rate levels, the payment schedule should show 12 payments of $804.62, 12 payments of $950.09, and 336 payments of $1,024.34. The finance charge should be $265,234.76 and the total of payments $365,234.76.

C. Same loan as above, except with a 7 1/2 percent cap on payment adjustments. The **disclosures** should reflect a composite annual percentage rate of 11.64 percent, based on 9 percent for one year and 12 percent for 29 years. Because of the payment cap, five levels of payments should be reflected. The payment schedule should show 12 payments of $804.62, 12 payments of $864.97, 12 payments of $929.84, 12 payments of $999.58, and 312 payments of $1,070.04. The finance charge should be $277,040.60, and the total of payments $377,040.60.

vi. A loan in which the initial interest rate is set according to the index or formula used for later adjustments but is not set at the value of the index or formula at consummation is not a discounted variable-rate loan. For example, if a creditor commits to an initial rate based on the formula on a date prior to consummation, but the index has moved during the period between that time and consummation, a creditor should base its **disclosures** on the initial rate.

11. *Examples of variable-rate transactions.* Variable-rate transactions include:

• Renewable balloon-payment instruments where the creditor is both unconditionally obligated to renew the balloon-payment loan at the consumer's option (or is obligated to renew subject to conditions within the consumer's control) and has the option of increasing the interest rate at the time of renewal. **Disclosures** must be based on the payment amortization (unless the specified term of the obligation with renewals is shorter) and on the rate in effect at the time of consummation of the transaction. (Examples of conditions within a consumer's control include requirements that a consumer be current in payments or continue to reside in the mortgaged property. In contrast, setting a limit on the rate at which the creditor would be obligated to renew or reserving the right to change the credit standards at the time of renewal are examples of conditions outside a consumer's control.) If, however, a creditor is not obligated to renew as described above, **disclosures** must be based on the term of the balloon-payment loan. **Disclosures** also must be based on the term of the balloon-payment loan in balloon-payment instruments in which the legal obligation provides that the loan will be renewed by a "refinancing" of the obligation, as that term is defined by § 226.20(a). If it cannot be determined from the legal obligation that the loan will be renewed by a "refinancing," **disclosures** must be based either on the term of the balloon-payment loan or on the payment amortization, depending on whether the creditor is unconditionally obligated to renew the loan as described above. (This discussion does not apply to construction loans subject to § 226.17(c)(6).)

• "Shared-equity" or "shared-appreciation" mortgages that have a fixed rate of interest and an appreciation share based on the consumer's equity in the mortgaged property. The appreciation share is payable in a lump sum at a specified time.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit No. 3

# CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES



Federal Reserve Board
Office of Thrift Supervision

This booklet was originally prepared in consultation with the following organizations:

American Bankers Association
America's Community Bankers
    (formerly the National Council of Savings Institutions and the U.S. League of Savings Institutions)
Comptroller of the Currency
Consumer Federation of America
Credit Union National Association, Inc.
Federal Deposit Insurance Corporation
Federal Reserve Board's Consumer
    Advisory Council
Federal Trade Commission
Independent Bankers Association of America
Mortgage Bankers Association of America
Mortgage Insurance Companies of America
National Association of Federal Credit Unions
National Association of Home Builders
National Association of Realtors
National Credit Union Administration
Office of Special Advisor to the President
    for Consumer Affairs
The Consumer Bankers Association
U.S. Department of Housing and
    Urban Development


*With special thanks to Fannie Mae (the Federal National Mortgage Association) and Freddie Mac (the Federal Home Loan Mortgage Corporation).*

The Federal Reserve Board and the Office of Thrift Supervision prepared this booklet on adjustable-rate mortgages (ARMs) in response to a request from the House Committee on Banking, Finance and Urban Affairs (currently, the Committee on Financial Services) and in consultation with many other agencies and trade and consumer groups. It is designed to help consumers understand an important and complex mortgage option available to homebuyers.

We believe a fully informed consumer is in the best position to make a sound economic choice. If you are buying a home and looking for a home loan, this booklet will provide useful basic information about ARMs. It cannot provide all the answers you will need, but we believe it is a good starting point.

**"Some newspaper ads for home loans show surprisingly low rates. Are these loans for real, or is there a catch?"**

Some of the ads you see are for adjustable-rate mortgages (ARMs). These loans may have low rates for a short time—maybe only for the first year. After that, the rates may be adjusted on a regular basis. This means that the interest rate and the amount of the monthly payment may go up or down.

**"Will I know in advance how much my payment may go up?"**

With an adjustable-rate mortgage, your future monthly payment is uncertain. Some types of ARMs put a ceiling on your payment increase or interest-rate increase from one period to the next. Virtually all types must put a ceiling on rate increases over the life of the loan.

**"Is an ARM the right type of loan for me?"**

That depends on your financial situation and the terms of the ARM. ARMs carry risks in periods of rising interest rates, but they can be cheaper over a longer term if interest rates decline. You will be able to answer the question better once you understand more about ARMs. This booklet should help.

Mortgages have changed, and so have the questions that consumers need to ask and have answered.

Shopping for a mortgage used to be a relatively simple process. Most home mortgage loans had interest rates that did not change over the life of the loan. Choosing among these fixed-rate mortgage loans meant comparing interest rates, monthly payments, fees, prepayment penalties, and due-on-sale clauses.

Today, many loans have interest rates (and monthly payments) that can change from time to time. To compare one ARM with another or with a fixed-rate mortgage, you need to know about indexes, margins, discounts, caps, negative amortization, and convertibility. You need to consider the maximum amount your monthly payment could increase. Most important, you need to compare what might happen to your mortgage costs with your future ability to pay.

This booklet explains how ARMs work and some of the risks and advantages to borrowers that ARMs introduce. It discusses features that can help reduce the risks and gives some pointers about advertising and other ways you can get information from lenders. Important ARM terms are defined in a glossary on page 19. And a checklist at the end of the booklet should help you ask lenders the right questions and figure out whether an ARM is right for you. Asking lenders to fill out the checklist is a good way to get the information you need to compare mortgages.

# WHAT IS AN ARM?

With a fixed-rate mortgage, the interest rate stays the same during the life of the loan. But with an ARM, the interest rate changes periodically, usually in relation to an index, and payments may go up or down accordingly.

Lenders generally charge lower initial interest rates for ARMs than for fixed-rate mortgages. This makes the ARM easier on your pocketbook at first than a fixed-rate mortgage for the same amount. It also means that you might qualify for a larger loan because lenders sometimes make the decision about whether to extend a loan on the basis of your current income and the first year's payments. Moreover, your ARM could be less expensive over a long period than a fixed-rate mortgage—for example, if interest rates remain steady or move lower.

Against these advantages, you have to weigh the risk that an increase in interest rates would lead to higher monthly payments in the future. It's a trade-off—you get a lower rate with an ARM in exchange for assuming more risk.

Here are some questions you need to consider:

- Is my income likely to rise enough to cover higher mortgage payments if interest rates go up?
- Will I be taking on other sizable debts, such as a loan for a car or school tuition, in the near future?
- How long do I plan to own this home? (If you plan to sell soon, rising interest rates may not pose the problem they do if you plan to own the house for a long time.)
- Can my payments increase even if interest rates generally do not increase?

# HOW ARMs WORK:
# THE BASIC FEATURES

### *The Adjustment Period*

With most ARMs, the interest rate and monthly payment change every year, every three years, or every five years. However, some ARMs have more frequent rate and payment changes. The period between one rate change and the next is called the "adjustment period." A loan with an adjustment period of one year is called a one-year ARM, and the interest rate can change once every year.

### *The Index*

Most lenders tie ARM interest-rate changes to changes in an "index rate." These indexes usually go up and down with the general movement of interest rates. If the index rate moves up, so does your mortgage rate in most circumstances, and you will probably have to make higher monthly payments. On the other hand, if the index rate goes down, your monthly payment may go down.

Lenders base ARM rates on a variety of indexes. Among the most common indexes are the rates on one-, three-, or five-year Treasury securities. Another common index is the national or regional average cost of funds to savings and loan associations. A few lenders use their own cost of funds as an index, which gives them more control than using other indexes. You should ask what index will be used and how often it changes. Also ask how it has fluctuated in the past and where it is published.

### *The Margin*

To determine the interest rate on an ARM, lenders add to the index rate a few percentage points, called the "margin." The amount of the margin may differ from one lender to another, but it is usually constant over the life of the loan.

---

Index rate + margin =
ARM interest rate

---

Let's say, for example, that you are comparing ARMs offered by two different lenders. Both ARMs are for 30 years and have a loan amount of $65,000. (All the examples used in this booklet are based on this amount for a 30-year term. Note that the payment amounts shown here do not include taxes, insurance, or similar items.)

Both lenders use the rate on one-year Treasury securities as the index. But the first lender uses a 2% margin, and the second lender uses a 3% margin. Here is how that difference in the margin would affect your initial monthly payment.

| | |
|---|---|
| Home sale price | $ 85,000 |
| Less down payment | − 20,000 |
| Mortgage amount | $ 65,000 |

Mortgage term  30 years

FIRST LENDER
One-year index = 8%
Margin = 2%
ARM interest rate = 10%
Monthly payment @ 10% = $570.42

SECOND LENDER
One-year index = 8%
Margin = 3%
ARM interest rate = 11%
Monthly payment @ 11% = $619.01

In comparing ARMs, look at both the index and margin for each program. Some indexes have higher values, but they are usually used with lower margins. Be sure to discuss the margin with your lender.

# CONSUMER CAUTIONS

### *Discounts*

Some lenders offer initial ARM rates that are lower than their "standard" ARM rates (that is, lower than the sum of the index and the margin). Such rates, called discounted rates, are often combined with large initial loan fees ("points") and with much higher rates after the discount expires.

Very large discounts are often arranged by the seller. The seller pays an amount to the lender so that the lender can give you a lower rate and lower payments early in the mortgage term. This arrangement is referred to as a "seller buydown." The seller may increase the sales price of the home to cover the cost of the buydown.

A lender may use a low initial rate to decide whether to approve your loan, based on your ability to afford it. You should be careful to consider whether you will be able to afford payments in later years when the discount expires and the rate is adjusted.

Here is how a discount might work. Let's assume that the lender's "standard" one-year ARM rate (index rate plus margin) is currently 10%. But your lender is offering an 8% rate for the first year. With the 8% rate, your first-year monthly payment would be $476.95.

But don't forget that with a discounted ARM, your initial payment will probably remain at $476.95 for only 12 months—and that any savings during the discount period may be made up during the life of the mortgage or may be included in the price of the house. In fact, if you buy a home using this kind of loan, you run the risk of . . .

## *Payment Shock*

Payment shock may occur if your mortgage payment rises very sharply at the first adjustment. Let's see what would happen in the second year if the rate on your discounted 8% ARM were to rise to the 10% "standard" rate.

| ARM Interest Rate | Monthly Payment |
|---|---|
| 1st year (w/discount) @ 8% | $476.95 |
| 2nd year @ 10% | $568.82 |

    As the example shows, even if the index rate were to stay the same, your monthly payment would go up from $476.95 to $568.82 in the second year.

    Suppose that the index rate increases 2% in one year and the ARM rate rises to 12%.

| ARM Interest Rate | Monthly Payment |
|---|---|
| 1st year (w/discount) @ 8% | $476.95 |
| 2nd year @ 12% | $665.43 |

    That's an increase of almost $200 in your monthly payment. You can see what might happen if you choose an ARM because of a low initial rate. You can protect yourself from large increases by looking for a mortgage with features, described next, that may reduce this risk.

# HOW CAN I REDUCE MY RISK?

Besides offering an overall rate ceiling, most ARMs also have "caps" that protect borrowers from extreme increases in monthly payments. Others allow borrowers to convert an ARM to a fixed-rate mortgage. While they may offer real benefits, these ARMs may also cost more, or may add special features such as negative amortization.

## *Interest-Rate Caps*

An interest-rate cap places a limit on the amount your interest rate can increase. Interest caps come in two versions:

- Periodic caps, which limit the interest-rate increase from one adjustment period to the next; and
- Overall caps, which limit the interest-rate increase over the life of the loan.

By law, virtually all ARMs must have an overall cap. Many have a periodic cap.

Let's suppose you have an ARM with a periodic interest-rate cap of 2%. At the first adjustment, the index rate goes up 3%. The example shows what happens.

| ARM Interest Rate | Monthly Payment |
|---|---|
| 1st year @10% | $570.42 |
| 2nd year @ 13% (without cap) | $717.12 |
| 2nd year @ 12% (with cap) | $667.30 |
| Difference in 2nd year between payment with cap and payment without = $49.82 | |

A drop in interest rates does not always lead to a drop in monthly payments. In fact, with some ARMs that have interest-rate caps, your payment amount may *increase* even though the index rate has stayed the same or declined. This may happen when an interest-rate cap has been holding your interest rate down below the sum of the index plus margin. If a rate cap holds down your interest rate, increases to the index that were not imposed because of the cap may carry over to future rate adjustments.

---

With some ARMs, payments may increase even if the index rate stays the same or declines.

---

The following example shows how carryovers work. The index increased 3% during the first year. Because this ARM limits rate increases to 2% at any one time, the rate is adjusted by only 2%, to 12% for the second year. However, the remaining

| ARM Interest Rate | Monthly Payment |
|---|---|
| First year @10% | $570.42 |
| If index rises 3% . . . | |
| 2nd year @ 12% (with 2% rate cap) | $667.30 |
| If index stays the same for the 3rd year @ 13% | $716.56 |
| Even though the index stays the same in 3rd year, payment goes up $49.26 | |

1% increase in the index carries over to the next time the lender can adjust rates. So when the lender adjusts the interest rate for the third year, the rate increases 1%, to 13%, even though there is no change in the index during the second year.

In general, the rate on your loan can go up at any scheduled adjustment date when the lender's standard ARM rate (the index plus the margin) is higher than the rate you are paying before that adjustment.

The next example shows how a 5% overall rate cap would affect your loan.

| ARM Interest Rate | Monthly Payment |
|---|---|
| 1st year @10% | $570.42 |
| 10th year @15% (with cap) | $813.00 |

Let's say that the index rate increases 1% in each of the next nine years. With a 5% overall cap, your payment would never exceed $813.00—compared to the $1,008.64 that it would have reached in the tenth year based on a 19% interest rate.

## Payment Caps

Some ARMs include payment caps, which limit your monthly payment increase at the time of each adjustment, usually to a percentage of the previous payment. In other words, with a 7½% payment cap, a

payment of $100 could increase to no more than $107.50 in the first adjustment period, and to no more than $115.56 in the second.

Let's assume that your rate changes in the first year by 2 percentage points but your payments can increase by no more than 7½% in any one year. Here's what your payments would look like:

| ARM Interest Rate | Monthly Payment |
|---|---|
| 1st year @10% | $570.42 |
| 2nd year @ 12% (without payment cap) | $667.30 |
| 2nd year @ 12% (with 7½% payment cap) | $613.20 |
| Difference in monthly payment = | $54.10 |

Many ARMs with payment caps do not have periodic interest-rate caps.

## *Negative Amortization*

If your ARM includes a payment cap, be sure to find out about "negative amortization." Negative amortization means that the mortgage balance increases. It occurs whenever your monthly mortgage payments are not large enough to pay all of the interest due on your mortgage.

Because payment caps limit only the amount of payment increases, and not interest-rate increases, payments some-

times do not cover all the interest due on your loan. This means that the interest shortage in your payment is automatically added to your debt, and interest may be charged on that amount. You might therefore owe the lender more later in the loan term than you did at the start. However, an increase in the value of your home may make up for the increase in what you owe.

The next illustration uses the figures from the preceding example to show how negative amortization works during one year. Your first 12 payments of $570.42, based on a 10% interest rate, paid the balance down to $64,638.72 at the end of the first year. The rate goes up to 12% in the second year. But because of the 7½% payment cap, your payments are not high enough to cover all the interest. The interest shortage is added to your debt (with interest on it), which produces negative amortization of $420.90 during the second year.

Beginning loan amount = $65,000

Loan amount at end of 1st year = $64,638.72

Negative amortization during 2nd year = $420.90

Loan amount at end of 2nd year = $65,059.62 ($64,638.72 + $420.90)

(If you sold your house at this point, you would owe almost $60 more than you originally borrowed.)

To sum up, the payment cap limits increases in your monthly payment by deferring some of the increase in interest. Eventually, you will have to repay the higher remaining loan balance at the ARM rate then in effect. When this happens, there may be a substantial increase in your monthly payment.

Some mortgages include a cap on negative amortization. The cap typically limits the total amount you can owe to 125% of the original loan amount. When that point is reached, monthly payments may be set to fully repay the loan over the remaining term, and your payment cap may not apply. You may limit negative amortization by voluntarily increasing your monthly payment.

Be sure to discuss negative amortization with the lender to understand how it will apply to your loan.

### *Prepayment and Conversion*

If you get an ARM and your financial circumstances change, you may decide that you don't want to risk any further changes in the interest rate and payment amount. When you are considering an ARM, ask for information about prepayment and conversion.

*Prepayment.* Some agreements may require you to pay special fees or penalties if you pay off the ARM early. Many ARMs allow you to pay the loan in full or in part without penalty whenever the rate is adjusted. Prepayment details are sometimes negotiable. If so, you may want to negotiate for no penalty, or for as low a penalty as possible.

*Conversion.* Your agreement with the lender may include a clause that lets you convert the ARM to a fixed-rate mortgage at designated times. When you convert, the new rate is generally set at the current market rate for fixed-rate mortgages.

The interest rate or up-front fees may be somewhat higher for a convertible ARM. Also, a convertible ARM may require a special fee at the time of conversion.

# WHERE TO GET INFORMATION

Before you actually apply for a loan and pay a fee, ask for all the information the lender has on the loan you are considering. It is important that you understand index rates, margins, caps, and other ARM features such as negative amortization. You can get helpful information from advertisements and disclosures, which are subject to certain federal standards.

## *Advertising*

Your first information about mortgages probably will come from newspaper advertisements placed by builders, real estate brokers, and lenders. Although this information can be helpful, keep in mind that the ads are designed to make the mortgage look as attractive as possible. These ads may play up low initial interest rates and monthly payments, without emphasizing that those rates and payments later could increase substantially. So get all the facts.

A federal law, the Truth in Lending Act, requires mortgage advertisers, once they begin advertising specific terms, to give further information on the loan. For example, if they want to show the interest rate or payment amount on the loan, they must also tell you the annual percentage rate (APR) and whether that rate may go up. The APR, the cost of your credit as a yearly rate, reflects more than just a low initial rate. It takes into account interest, points paid on the loan, any loan origination fee, and any mortgage insurance premiums you may have to pay.

Ads may play up low initial rates. Get all the facts.

### *Disclosures From Lenders*

Federal law requires the lender to give you information about ARMs, in most cases before you apply for a loan. The lender also is required to give you information when you apply for a mortgage. You should get a written summary of important terms and costs of the loan. Some of these are the finance charge, the APR, and the payment terms.

---

Read information from lenders–and ask questions– before committing yourself.

---

Selecting a mortgage may be the most important financial decision you will make, and you are entitled to all the information you need to make the right decision. Don't hesitate to ask questions about ARM features when you talk to lenders, real estate brokers, sellers, and your attorney, and keep asking until you get clear and complete answers. The checklist at the back of this booklet is intended to help you compare terms on different loans.

# GLOSSARY

### *Adjustable-Rate Mortgage (ARM)*

A mortgage for which the interest rate is not fixed, but changes during the life of the loan in line with movements in an index rate. You may also see ARMs referred to as *AMLs (adjustable-mortgage loans)* or *VRMs (variable-rate mortgages)*.

### *Annual Percentage Rate (APR)*

A measure of the cost of credit, expressed as a yearly rate. It includes interest as well as other charges. Because all lenders follow the same rules when calculating the APR, it provides consumers with a good basis for comparing the cost of loans, including mortgages.

### *Assumability*

When a home is sold, the seller may be able to transfer the mortgage to the new buyer. This means the mortgage is assumable. Lenders generally require a credit review of the new borrower and may charge a fee for the assumption. Some mortgages contain a *due-on-sale* clause, which means that the mortgage may not be transferable to a new buyer. Instead, the lender may make you pay the entire balance that is due when you sell the home. Assumability can help you attract buyers if you sell your home.

### *Buydown*

With a buydown, the seller pays an amount to the lender so that the lender can give you a lower rate and lower payments, usually for an early period in an ARM. The seller may increase the sales price to cover the cost of the buydown. Buydowns can occur in all types of mortgages, not just ARMs.

### *Cap*

A limit on how much the interest rate or the monthly payment may change, either at each adjustment or during the life of the mortgage. Payment caps don't limit the amount of interest the lender is earning, so they may cause *negative amortization.*

### *Conversion Clause*

A provision in some ARMs that allows you to change the ARM to a fixed-rate loan at some point during the term. Conversion is usually allowed at the end of the first adjustment period. At the time of the conversion, the new fixed rate is generally set at one of the rates then prevailing for fixed-rate mortgages. The conversion feature may be available at extra cost.

## Discount

In an ARM with an initial rate discount, the lender gives up a number of percentage points in interest to give you a lower rate and lower payments for part of the mortgage term (usually for one year or less). After the discount period, the ARM rate will probably go up depending on the index rate.

## Index

The index is the measure of interest-rate changes that the lender uses to decide how much the interest rate on an ARM will change over time. No one can be sure when an index rate will go up or down. To help you get an idea of how to compare different indexes, the following chart shows a few common indexes over an eleven-year period (1990-2000). As you can see, some index



SELECTED
INDEX RATES FOR ARMs
OVER AN ELEVEN-YEAR PERIOD

rates tend to be higher than others, and some more volatile. (But if a lender bases interest-rate adjustments on the average value of an index over time, your interest rate would not be as volatile.) You should ask your lender how the index for any ARM you are considering has changed in recent years, and where the index is reported.

## *Margin*

The number of percentage points the lender adds to the index rate to calculate the ARM interest rate at each adjustment.

## *Negative Amortization*

Amortization means that monthly payments are large enough to pay the interest and reduce the principal on your mortgage. Negative amortization occurs when the monthly payments do not cover all the interest cost. The interest cost that isn't covered is added to the unpaid principal balance. This means that even after making many payments, you could owe more than you did at the beginning of the loan. Negative amortization can occur when an ARM has a payment cap that results in monthly payments not high enough to cover the interest due.

### *Points*

One point is equal to 1 percent of the principal amount of your mortgage. For example, if the mortgage is for $65,000, one point equals $650. Lenders frequently charge points in both fixed-rate and adjustable-rate mortgages in order to increase the yield on the mortgage and to cover loan closing costs. These points usually are collected at closing and may be paid by the borrower or the home seller, or may be split between them.

# MORTGAGE CHECKLIST

*Ask your lender to help fill out this checklist.*

*Mortgage amount*

## Basic Features for Comparison

Fixed-rate annual percentage rate
(the cost of your credit as a yearly rate,
including both interest and other charges)

ARM annual percentage rate

    Adjustment period

    Index used and current rate

    Margin

    Initial payment without discount

    Initial payment with discount (if any)

    How long will discount last?

    Interest-rate caps:    periodic

                       overall

    Payment caps

    Negative amortization

    Convertibility or prepayment privilege

    Initial fees and charges

## Monthly Payment Amounts

What will my monthly payment be
after 12 months if the index rate:

stays the same

goes up 2%

goes down 2%

What will my monthly payment be after
3 years if the index rate:

stays the same

goes up 2% per year

goes down 2% per year

Take into account any caps on your mortgage
and remember that it may run 30 years.

Mortgage A       Mortgage B

$                 $

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

Revised:  2001  Reprinted:  June  2001  250,000

**Exhibit No. 4**

Joint Press Release

Board of Governors of the Federal Reserve System
Office of Thrift Supervision

**For immediate release**
**December 26, 2006**

### *Federal Reserve Board and Office of Thrift Supervision Issue Revised Consumer Handbook on Adjustable-Rate Mortgages*

The Federal Reserve Board and the Office of Thrift Supervision today announced the availability of a revised Consumer Handbook on Adjustable-Rate Mortgages (the CHARM booklet), which provides information to consumers about the features and risks of such loans. In recognition of the growing use of nontraditional mortgage products that allow borrowers to defer payment of principal and sometimes interest, the agencies have substantially revised the CHARM booklet to include discussions about "interest-only" and "payment option" mortgages.

The revised booklet describes how these loans typically work, showing how much (and how often) monthly payments could increase, and how the loan balance could increase if minimum monthly payments are made. The booklet includes a mortgage shopping worksheet to help consumers compare the features of different products, and a glossary to help them understand some of the terminology.

Under the Board's Regulation Z (which implements the Truth in Lending Act), creditors must provide a copy of the CHARM booklet, or a suitable substitute, to consumers with every application for an adjustable rate mortgage loan. The Board is publishing a notice in the *Federal Register* informing creditors that they may begin immediately using the revised CHARM booklet, but also have the option to continue using their existing stock of CHARM booklets until October 1, 2007, the date when they must use the revised CHARM booklet (or suitable substitute) to comply with Regulation Z.

The agencies originally published the CHARM booklet in 1987, to help educate consumers about adjustable rate mortgage loans. The booklet, which has been updated periodically, is available on the Internet at /pubs/arms/arms_english.htm. The Spanish version of the revised booklet is forthcoming.

Up to 100 copies of the brochure are available free of charge from: Publications, Mail Stop 127, Federal Reserve Board, 20th and C Streets, N.W., Washington, DC 20551; 202-452-3245

The *Federal Register* notice is attached.

Federal Register Notice 54 KB PDF | TEXT