1  David M. Arbogast (SBN 167571)
   darbogast@law111.com
2  Jeffrey K. Berns, Esq. (SBN 131351)
   jberns@jeffbernslaw.com
3  **ARBOGAST & BERNS LLP**
   19510 Ventura Boulevard, Suite 200
4  Tarzana, California 91356
   Phone: (818) 961-2000; Fax:  (818) 867-4820
5
   Paul R. Kiesel, Esq. (SBN 119854)
6  kiesel@kbla.com
   Patrick DeBlase, Esq. (SBN 167138)
7  deblase@kbla.com
   Michael C. Eyerly, Esq. (SBN 178693)
8  eyerly@kbla.com
   **KIESEL BOUCHER LARSON LLP**
9  8648 Wilshire Boulevard
   Beverly Hills, California 90211
10 Phone:  (310) 854-4444; Fax: (310) 854-0812

11 Attorneys for Plaintiff and all others Similarly Situated

12             **UNITED STATES DISTRICT COURT**

13       **NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION**

14
15 ARMANDO PLASCENCIA, and MELANIA )   **CASE NO. C-07-4485 CW**
   PLASCENCIA, individually and on behalf of )
   all others similarly situated,          )   CLASS ACTION
16                                         )
                Plaintiffs,                )
17                                         )   **DECLARATION OF DAVID M. ARBOGAST IN**
                                           )   **SUPPORT OF PLAINTIFFS' OPPOSITION TO**
18      v.                                 )   **DEFENDANT EMC MORTGAGE**
                                           )   **CORPORATION'S MOTION TO DISMISS**
19                                         )
   LENDING 1st MORTGAGE and LENDING )
20 1st MORTGAGE, LLC, and DOES 1 through )   Hearing Date: September 25, 2008
   10 inclusive,                           )   Time:          2:00 p.m.
21                                         )   Place:         Courtroom 2
                Defendants.                )   Judge:         Hon. Claudia Wilken
22                                         )
                                           )
23                                         )   Complaint Filed: August 29, 2007
                                           )   Trial Date: Not set yet.
24
25
26
27
28

ARBOGAST DECL. I.S.O. EMC'S MTN. TO DISMISS - C-07-4485 CW

1        1.        I am an active member of the State Bar of California, admitted December, 1993, and I am

2   a member of the Bar of this Court.  I am one of the attorneys of record for Plaintiffs in this action.

3        2.        **Exhibit 1**, attached hereto are true and correct copies of relevant pages from pages from

4   Defendant EMC Mortgage Corporation's website, www.emcmortgagecorp.com;

5        3.        **Exhibit 2**, attached hereto are true and correct copies of relevant pages from 141 Cong.

6   Rec. S14566-03, S14567 (1995) (statement of Sen. Sarbanes);

7        4.        **Exhibit 3**, attached hereto are true and correct copies of relevant pages from 12 C.F.R.

8   226.23(a)(3);;

9        5.        **Exhibit 4**, attached hereto is a true and correct copies of relevant pages from 12 C.F.R.

10  Pt. 226, Supp. I, cmt. §226.23; and

11       6.        **Exhibit 5**, attached hereto are true and correct copy of relevant pages from the Senate

12  Report, S. Rep. 96-73, pp. 17-18 (Apr. 24, 1979).

13       I declare under penalty of perjury under the laws of the United States of America that the

14  foregoing is true and correct and was executed in the State of California on September 4, 2008.

15

16                                   */s/ David M. Arbogast*
                                     DAVID M. ARBOGAST
17

18

19

20

21

22

23

24

25

26

27

28

ARBOGAST DECL. I.S.O. EMC'S MTN. TO DISMISS - C-07-4485 CW

**Exhibit No. 1**



EMC Mortgage Corporation, a wholly owned subsidiary of JPMorgan Chase & Co., is a mortgage banking company that specializes in the servicing of residential mortgage loans. With a staff of more than 1,600 employees, the company is headquartered in Lewisville, Texas within the Dallas-Fort Worth metroplex, with additional offices in Irvine, California. The company's proven success is built on a foundation of providing competitive pricing and excellent portfolio management.

EMC Mortgage's track record in providing quality customer service to borrowers and excellent portfolio servicing to investors is largely attributable to the expertise of management and staff. They are among the most experienced in the industry. EMC Mortgage's management team has in-depth knowledge of customer service, collections, loan workouts, foreclosure administration, and accounting.

While keeping the customer in mind at all times, EMC Mortgage executes the firm's value maximization philosophy and company strategy of thinking creatively. Regardless of investor, EMC Mortgage strives to conduct each servicing function as if it were being administered to their own asset. Employee training is a top priority with emphasis on regulatory compliance and collections. The company continuously examines methodologies, thinks creatively, and exercises financial prudence in every step of the servicing process. All employees receive extensive training to ensure proficiency in the latest technology and industry practices. Additionally, EMC Mortgage promotes advancement from within through team building and management training, which allows the company to retain the best employees in a highly competitive labor market.

Other noteworthy points:

- We are a member of the MBA
- Service over 480,000 loans
- Utilize each of the following rating agencies and have received favorable ratings -
  - Fitch

|  |  |
|---|---|
| Residential Primary Servicer / Subprime | RPS1 |
| Residential Special Servicer | RSS1 |
| Residential Primary Servicer / Alt-A | RPS1 |
| Master Servicer | RMS3+ |

  - Moody's

|  |  |
|---|---|
| Primary Servicer / Subprime | SQ1- |
| Special Servicer | SQ2+ |
| Primary Servicer/Prime Alt A | SQ2 |
| Primary Servicer/2nd Liens | SQ2 |
| Master Servicer | SQ3 |

  - Standard and Poor's

|  |  |
|---|---|
| Residential Servicer | Above Average |
| Residential Special Servicer | Above Average |
| Residential Subprime Servicer | Above Average |
| Master Servicer | Average |

  - 

Your use of this website and content accessible herein is subject to:
Access Agreement
© 2006 EMC Mortgage Corporation



## Our Mission

### We are committed to providing outstanding mortgage services, and we will do it better than anyone else!

As a responsible mortgage banker and servicer, EMC Mortgage Corporation fully complies with all laws and regulations applicable to our business operations, including but not limited to the Fair Debt Collection Practices Act, the Fair Housing Act of 1968, the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, and the Equal Credit Opportunity Act. EMC is committed to providing high quality and ethical service to all our Customers. EMC does not tolerate abusive, misleading, or fraudulent servicing practices. Moreover, EMC strives to treat all Customers equally, and accordingly, does not discriminate on the basis of race, color, national origin, religion, gender, familial status, age or disability.

EMC is pleased to present our *"Best Servicing Practices"*, which reflect the company's mission to provide outstanding mortgage services.


## Best Servicing Practices

### The Right Start

In order to assure a smooth transition of our Customer's accounts to EMC, we review all loan terms to ensure we have the appropriate information loaded into our system. We send a Welcome Package to our Customers that contains helpful information, including payment information and coupons. We also place welcome calls to all new Customers to confirm that all payments made to prior servicers have been timely credited and that any outstanding issues are resolved and questions answered.

### Customer Service, Satisfaction & Convenience

- EMC is committed to the highest levels of Customer service, satisfaction and convenience. We provide a comprehensive, automated information system to our Customers. *"Customer Care Net"*, a web tool found at www.emcmortgageservicing.com, provides Customers access to their loan information 24 hours a day, 7 days a week. Customers are also able to obtain information through our easy-to-use interactive voice response system, which supports both our English and Spanish-speaking Customers.
- EMC's *"One Call Resolution"* policy is to take care of our Customers' needs during their first phone call to EMC. Our Call Center Agents are trained to resolve all Customer issues promptly and aim to do so without transferring Customers to other departments.
- EMC maintains a dedicated Customer Relations Department to address Customer inquiries and employs staff fluent in Spanish to assist our Spanish-speaking Customers.
- Customer service personnel are evaluated on their ability to resolve Customer complaints to the Customer's satisfaction. Employees with the highest satisfaction ratings are recognized and rewarded.
- To ensure that our Customers receive the attention they desire and deserve, a Customer Advocate is available to listen to unresolved Customer complaints and present recommendations for resolution to senior management. Customers may contact Customer Service for assistance at 800-723-3004, and for additional assistance, the Customer Advocate may be reached directly at 800-695-7695 *(ext. 7377)* or via email at EMCCustomerAdvocate@Bear.com.

### Payment Processing/Billing Statements

- EMC's policy is to post all payments on the first business day payments are received and identified. In circumstances where payments cannot be immediately identified and posted *(where, for example, a loan number is not included with a payment)*, EMC's records will reflect a loan posting as of the date the payment was received once identification is made.
- Billing statements are sent to Customers on a monthly basis. Statements provide itemized information as to amounts owed, including fees and servicing advances, and detailed information regarding all aspects of a Customer's account. Monthly billing statements are also available online through a secure website at www.emcmortgageservicing.com.

- For option arm products, EMC's monthly statements include information explaining how the Customer's various payment options will affect the loan balance and future amounts owed so that Customers are able to make informed decisions about their payment options.

## Lender Placed Insurance

- EMC monitors Customer accounts to ensure adequate hazard and/or flood insurance coverage is maintained at all times.
- Once EMC is notified that there is no insurance coverage, we will send the Customer a series of letters over a period of 60 days and make phone calls requesting proof of insurance. In these letters, we encourage our Customers to purchase their own insurance to obtain the most favorable pricing and coverage.
- Although documentation of insurance coverage is required, if at any time a Customer verbally represents that he or she has insurance coverage in effect, EMC will attempt to obtain written documentation of insurance on the Customer's behalf by contacting the Customer's insurance agent.
- If it becomes necessary for EMC to obtain a lender placed policy for the Customer, EMC has competitive lender placed insurance rates.
- Even after a lender's policy is placed, we encourage Customers to obtain their own policy. We will provide premium reimbursement to Customers who subsequently provide proof of coverage, only charging a premium for any days not covered by the Customer's policy.

## Home Retention Strategies

- We want Customers to be able to keep their homes. In most cases, foreclosure results in a loss not only to our Customers but to EMC and its Investors.
- Customers who are at high risk of default may obtain assistance from EMC's *"Performing Loan Workouts"* team even before their loans become delinquent. This team's primary goal is to help homeowners with current adjustable rate mortgages *(ARMs)* whose loans will reset in the next 60 days or have reset in the current or prior three months as well as customers who are current on their loan, yet face life-challenging events such as a job loss, death in the family, health problem or other difficult situation.
- Upon delinquency, home retention specialists evaluate loans before the foreclosure process begins to ensure that a variety of home retention options have been explored. EMC strives to find the best solution for our Customers, based on their willingness and ability to work with us.
- Even after referral to foreclosure, home retention representatives actively solicit workout arrangements to stop the foreclosure process.
- EMC's home retention strategies do not require Customers to waive any claims or defenses they may have.
- We do not assess late charges if the Customer makes timely payments under a repayment plan even though the loan remains delinquent during this time.
- We do not charge modification fees.
- EMC encourages customers to seek professional credit counseling where necessary and appropriate. EMC has established a relationship with Consumer Credit Counseling Services, an independent, non-profit counseling service, and will pay the credit counseling fee for Customers who seek their assistance. The national toll-free number for referrals is 1-800-388-2227 or www.nfcc.org. Other resources or assistance may be available through HUD (202-708-1112) or www.hud.gov. EMC also supports counseling and ongoing assistance programs offered by NeighborWorks America. NeighborWorks may be contacted at 1-888-995-HOPE or www.995HOPE.org.

## Collections

EMC has a variety of tools to assist Customers who experience financial hardship. Our goal is to keep our Customers in their homes by exploring all avenues to help them through difficult financial times. Effective and early communication is an integral component of working through delinquency. Our courteous and understanding staff treats Customers with respect and dignity. We encourage our Customers who are experiencing financial difficulty to call our loan counselor team at 1-800-723-3004.

## Pre-foreclosure Screening

All loans are pre-screened prior to initiating foreclosure to ensure that foreclosure is appropriate.
A committee of senior executives conducts an additional review of any loan that fails to meet the screening criteria so

that no loan is referred to foreclosure unless foreclosure is the only appropriate course of action. We continuously look for ways to help Customers keep their homes while at the same time satisfying the debt that they owe.

## Protecting Privacy of Customer's Data

EMC Mortgage has a long standing policy of protecting the confidentiality and security of our Customers' confidential information. Federal and state law and regulations require EMC to implement policies to protect personal information of Customers and provide Customers with a written notice of our Privacy Policy. Safeguarding Customer data is very important to EMC. We have robust privacy and security procedures and controls for our employees, contractors and vendors, all of whom are audited from time to time to ensure compliance with the law and our policies. These policies not only govern electronic data but also cover physical access to our facilities, personal background checks prior to employment, and the shredding and destruction of paper documents. In addition, all personally identifiable Customer data that leaves our secure environment is encrypted. EMC's strong safeguards protect our Customers from identity theft. For assistance with identity theft, call 877-Fraud-44 (877-372-8344).

## Fair Fees

Servicing fees are monitored to ensure they are fair, reasonable and compliant with state and federal laws. EMC's fees are competitive within the industry, and many services are provided free of charge, including:

- Opening an escrow account
- ACH monthly payments
- Automated speed payments
- Copies of appraisals and other loan documents
- Amortization schedules
- Payment histories
- Verifications of mortgage
- Duplicate IRS year-end forms (1098;1099)
- Modifications

## Credit Reporting

EMC reports Customers' payment history to major credit reporting agencies on a monthly basis, which assists our Customers in building and maintaining a strong credit history if payments are timely made. In the event there is a complaint or dispute about our credit reporting, we immediately report the dispute to the credit reporting agencies and take prompt action to resolve the dispute.

## Quality Assurance

EMC has comprehensive quality control measures at several different levels, including internal self-auditing programs, a well-staffed Quality Assurance Department that monitors adherence to internal service standards, policies and procedures, and applicable laws and regulations, and a full-time Internal Audit Department.

## Employee Training

All employees receive training on applicable laws as well as EMC's policies, procedures, and service standards. Audits are conducted to ensure employees' compliance. EMC also conducts call monitoring to ensure employees are meeting Customers' needs and acting in accordance with company policy as well as all applicable laws and regulations. Insofar as an audit reveals concerns about an employee's compliance with policies, procedures, or expectations regarding service levels, EMC acts swiftly to address those issues.

## Customer Surveys

EMC retains an independent polling company to conduct frequent surveys of randomly selected Customers to ensure Customer satisfaction. While we believe that the majority of our Customers are pleased with the level of service that

EMC provides, if any Customer indicates dissatisfaction, we take steps to not only resolve that Customer's concern but to remedy any processes that may cause additional Customer concerns in the future.



**Exhibit No. 2**



141 Cong.Rec. S14566-03                                                                 Page 1
141 Cong. Rec. S14566-03, 1995 WL 570654 (Cong.Rec.)
**(Cite as: 141 Cong. Rec. S14566-03)**

Congressional Record --- Senate
Proceedings and Debates of the 104th Congress, First Session
Thursday, September 28, 1995

**\*S14566** TRUTH IN LENDING ACT AMENDMENTS

Mr. GRAMM.

Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of H.R. 2399 just received from the House.

The PRESIDING OFFICER.

The clerk will report.

The assistant legislative clerk read as follows:

A bill (H.R. 2399) to amend the Truth in Lending Act to clarify the intent of such act and to reduce burdensome regulatory requirements on creditors.

The PRESIDING OFFICER.

Is there objection to the immediate consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

Mr. D'AMATO.

Mr. President, I rise today to voice my support for the Truth in Lending Act Amendments of 1995. Our colleagues in the House recently passed this legislation. It is the product of bipartisan cooperation between the Senate and the House. The broad bipartisan support that this bill has attracted is evidence of the urgency of the situation that it addresses. As chairman of the Banking Committee, I believe that immediate action **\*S14567** is warranted. I would therefore encourage my colleagues to immediately consider and pass H.R. 2399.

Mr. President, H.R. 2399 is intended to curtail the devastating liability that threatens our housing finance system in the wake of the Eleventh Circuit Court of Appeals' recent decision in Rodash versus AIB Mortgage Co. The Rodash case produced an onslaught of over 50 class action suits. The majority of these suits demanded the most draconian remedy available under Truth in Lending-rescission. When a loan is rescinded, the borrower is released from the obligation under the mortgage. Currently, there are dozens of Rodash-styled class action suits pending. If rescission is granted in a class action lawsuit, every class member would be entitled to reimbursement of all finance charges, as well as other charges.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The bill before the Senate today improves significantly the measure passed by the House Banking Committee. Under the original House bill, consumers would have lost the right of rescission for a whole class of loans even if the most egregious violations of the Truth in Lending Act were committed. The bill before the Senate preserves that vital consumer protection.

The original House bill also would have eliminated, for an entire class of mortgage loans, the borrower's right to a 3-day cooling off period after closing on a loan. The bill before the Senate retains that cooling off period.

Moreover, the bill before the Senate protects the most vulnerable citizens from abusive lenders. It provides consumers with truth in lending protections when faced with foreclosure. This bill will help many elderly people keep their homes.

This bill increases the tolerance for statutory damages, lifting the bar that determines what constitutes a violation. This bill does not increase the tolerance as much as the original House bill. This is important because a low tolerance is needed to ensure that consumers are receiving accurate information about the cost of credit.

This increased tolerance for errors is intended to protect lenders from the small errors in judgment that occurred in the Rodash case. It is obviously not intended to give lenders the right to pad fees up to the tolerance limit of $100. For example, if a delivery associated with the closing cost on a home mortgage costs $30, $30 should be charged and disclosed as part of the finance charge. A lender cannot arbitrarily raise the charge an additional $70 simply because there is a wider tolerance.

The purpose of the Truth in Lending Act is to require disclosure to consumers of the cost of their credit. An outstanding problem remains that there are too many exclusions and exemptions that blur the bottom line. The **\*S14568** bill directs the Federal Reserve to report to Congress and develop regulations to ensure that all charges related to the extension of credit are included in the finance charges. Lenders and consumers agree that it is important to alleviate confusion over the treatment of fees in the finance charge. The Federal Reserve has 1 year to develop these regulations.

The bill specifically exempts certain charges from the finance charge, including third party fees, taxes on security instruments, fees for preparations of loan documents, and fees relating to pest infestations. The purpose of the exemptions is to provide some clarity on the treatment of those fees until the Fed acts to ensure that the finance charge definition more accurately reflects the cost of providing credit. The fact that these exemptions are included does not create a presumption or requirement for the Fed to exclude them from the definition of finance charges. The Fed should include all charges in the finance charge unless those charges are not related to the extension of credit. I look forward to the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit No. 3**

12 C.F.R. § 226.23



**Effective: December 10, 2007**

Code of Federal Regulations Currentness
   Title 12. Banks and Banking
     Chapter II. Federal Reserve System
       Subchapter A. Board of Governors of the Federal Reserve System
         Part 226. Truth in Lending (Regulation Z) (Refs & Annos)
           Subpart C. Closed-End Credit

➡ **§ 226.23 Right of rescission.**

<For compliance date(s) of subsection (b)(1), see 72 FR 63462.>

(a) Consumer's right to rescind.

(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section. [FN47]

  [FN47] For purposes of this section, the addition to an existing obligation of a security interest in a consumer's principal dwelling is a transaction. The right of rescission applies only to the addition of the security interest and not the existing obligation. The creditor shall deliver the notice required by paragraph (b) of this section but need not deliver new material disclosures. Delivery of the required notice shall begin the rescission period.

  (2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

<Text of subsection (a)(3) effective until Oct. 1, 2009.>

  (3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, [FN48] whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.

  [FN48] The term "material disclosures" means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total payments, the payment schedule, and the disclosures and limitations referred to in § 226.32(c) and (d).

<Text of subsection (a)(3) effective Oct. 1, 2009.>

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit No. 4**

12 C.F.R. Pt. 226, Supp. I

## Effective: January 14, 2008

Code of Federal Regulations Currentness
    Title 12. Banks and Banking
        Chapter II. Federal Reserve System
            Subchapter A. Board of Governors of the Federal Reserve System
                Part 226. Truth in Lending (Regulation Z) (Refs & Annos)

➡ **SUPPLEMENT I TO PART 226--OFFICIAL STAFF INTERPRETATIONS**

<For compliance date(s) of amendment(s) to supplement, see 72 FR 63462;
73 FR 44522.>

### Introduction

1. Official status. This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z, as revised effective April 1, 1981. Good faith compliance with this commentary affords protection from liability under 130(f) of the Truth in Lending Act. Section 130(f) (15 U.S.C. 1640) protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the Federal Reserve System.

2. Procedure for requesting interpretations. Under appendix C of the regulation, anyone may request an official staff interpretation. Interpretations that are adopted will be incorporated in this commentary following publication in the Federal Register. No official staff interpretations are expected to be issued other than by means of this commentary.

3. Status of previous interpretations. All statements and opinions issued by the Federal Reserve Board and its staff interpreting previous Regulation Z remain effective until October 1, 1982, only insofar as they interpret that regulation. When compliance with revised Regulation Z becomes mandatory on October 1, 1982, the Board and staff interpretations of the previous regulation will be entirely superseded by the revised regulation and this commentary except with regard to liability under the previous regulation.

4. Rules of construction. (a) Lists that appear in the commentary may be exhaustive or illustrative; the appropriate construction should be clear from the context. In most cases, illustrative lists are introduced by phrases such as "including, but not limited to," "among other things," "for example," or "such as."

(b) Throughout the commentary and regulation, reference to the regulation should be construed to refer to revised Regulation Z, unless the context indicates that a reference to previous Regulation Z is also intended.

(c) Throughout the commentary, reference to "this section" or "this paragraph" means the section or paragraph in the regulation that is the subject of the comment.

5. Comment designations. Each comment in the commentary is identified by a number and the regulatory section or paragraph which it interprets. The comments are designated with as much specificity as possible according to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. Pt. 226, Supp. I

2. Material disclosures. Footnote 48 sets forth the material disclosures that must be provided before the rescission period can begin to run. Failure to provide information regarding the annual percentage rate also includes failure to inform the consumer of the existence of a variable rate feature. Failure to give the other required disclosures does not prevent the running of the rescission period, although that failure may result in civil liability or administrative sanctions.

3. Unexpired right of rescission. When the creditor has failed to take the action necessary to start the three-business day rescission period running, the right to rescind automatically lapses on the occurrence of the earliest of the following three events:

. The expiration of three years after consummation of the transaction.

. Transfer of all the consumer's interest in the property.

. Sale of the consumer's interest in the property, including a transaction in which the consumer sells the dwelling and takes back a purchase money note and mortgage or retains legal title through a device such as an installment sale contract.

Transfer of all the consumers' interest includes such transfers as bequests and gifts. A sale or transfer of the property need not be voluntary to terminate the right to rescind. For example, a foreclosure sale would terminate an unexpired right to rescind. As provided in section 125 of the Act, the three-year limit may be extended by an administrative proceeding to enforce the provisions of this section. A partial transfer of the consumer's interest, such as a transfer bestowing co-ownership on a spouse, does not terminate the right of rescission.

Paragraph 23(a)(4).

1. Joint owners. When more than one consumer has the right to rescind a transaction, any of them may exercise that right and cancel the transaction on behalf of all. For example, if both husband and wife have the right to rescind a transaction, either spouse acting alone may exercise the right and both are bound by the rescission.

23(b) Notice of right to rescind.

1. Who receives notice. Each consumer entitled to rescind must be given:

• Two copies of the rescission notice.

• The material disclosures.

In a transaction involving joint owners, both of whom are entitled to rescind, both must receive the notice of the right to rescind and disclosures. For example, if both spouses are entitled to rescind a transaction, each must receive two copies of the rescission notice (one copy to each if the notice is provided in electronic form in accordance with the consumer consent and other applicable provisions of the E-Sign Act) and one copy of the disclosures.

2. Format. The notice must be on a separate piece of paper, but may appear with other information such as the itemization of the amount financed. The material must be clear and conspicuous, but no minimum type size or other technical requirements are imposed. The notices in appendix H provide models that creditors may use in giving the notice.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit No. 5**

Westlaw.

S. REP. 96-73                                                      Page 1
S. REP. 96-73, S. Rep. No. 73, 96TH Cong., 1ST Sess. 1979, 1980 U.S.C.C.A.N. 280, 1979 WL 10376 (Leg.Hist.)
**(Cite as: S. REP. 96-73, 1980 U.S.C.C.A.N. 280)**

P.L. 96-221, DEPOSITORY INSTITUTIONS DEREGULATION AND MONETARY CONTROL
ACT OF 1980
SEE PAGE 94 STAT. 132)
SENATE REPORT (BANKING, HOUSING, AND URBAN AFFAIRS
COMMITTEE) NO. 96-368, OCT. 15, 1979 (TO ACCOMPANY
H.R. 4986)
SENATE REPORT (BANKING, HOUSING, AND URBAN AFFAIRS
COMMITTEE) NO. 96-73, APR. 24, 1979 (TO ACCOMPANY
S. 108)
HOUSE CONFERENCE REPORT NO. 96-842, MAR. 21, 1980 (TO
ACCOMPANY H.R. 4986)
SENATE CONFERENCE REPORT NO. 96-640, MAR. 21, 1980 (TO
ACCOMPANY H.R. 4986)
CONG. RECORD VOL. 125 (1979)
CONG. RECORD VOL. 126 (1980)
DATES OF CONSIDERATION AND PASSAGE
HOUSE SEPTEMBER 11, NOVEMBER 7, 1979; MARCH 27, 1980
SENATE MAY 1, NOVEMBER 1, 1979; MARCH 28, 1980
NO HOUSE REPORT WAS SUBMITTED WITH THIS LEGISLATION.  THE
SENATE REPORTS 96-368 AND 96-73, (THIS PAGE AND (PAGE
280) AND THE HOUSE CONFERENCE REPORT (PAGE 298) ARE SET
OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)


SENATE REPORT NO. 96-73
APR. 24, 1979
 **\*1 \*\*280** THE COMMITTEE ON BANKING, HOUSING AND URBAN AFFAIRS HAVING CONSIDERED
THE SAME TO AMEND THE TRUTH-IN-LENDING ACT TO FACILITATE COMPLIANCE BY SIMPLIFYING
THE REQUIREMENTS IMPOSED UNDER THAT ACT, TO FACILITATE ADMINISTRATIVE RESTITUTION
ENFORCEMENT OF THAT ACT, AND FOR OTHER PURPOSES, REPORTS FAVORABLY, THEREON WITH
AMENDMENTS, AND RECOMMENDS THAT THE BILL AS AMENDED DO PASS.


INTRODUCTION

 THE COMMITTEE HAD REFERRED TO IT FOUR BILLS IN THE 95TH CONGRESS TO SIMPLIFY AND
REFORM THE TRUTH IN LENDING ACT:  S. 1312, INTRODUCED BY SENATOR PROXMIRE; S.
1502, INTRODUCED BY SENATORS GARN, SCHMITT, AND TOWER; S. 1653, INTRODUCED BY SEN-
ATOR RIEGLE; AND S. 1846, INTRODUCED BY SENATOR PROXMIRE ON REQUEST OF THE FEDERAL
RESERVE BOARD.
 THE CONSUMER AFFAIRS SUBCOMMITTEE HELD HEARINGS ON THESE BILLS ON JULY 11, 12
AND 13, 1977, AND THE COMMITTEE CONSIDERED THE LEGISLATION IN MARKUP SESSIONS ON

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ANCE.  THE BILL WOULD, HOWEVER, ELIMINATE LIABILITY FOR DISCLOSURE ON THE MONTHLY
BILLING STATEMENT OF THE DATE AND IDENTITY OF A PURCHASE ON THE GROUND THAT THE
FAIR CREDIT BILLING ACT (CHAPTER 4 OF THE ACT) PROVIDES AN ADEQUATE CONSUMER REM-
EDY.  SHOULD THE AMOUNT OF THE PURCHASE BE INCORRECT, HOWEVER, STATUTORY PENALTIES
WOULD ATTACH, AS THE MONTHLY CLOSING BALANCE WOULD BE INACCURATE.

THE COMMITTEE IS OF THE BELIEF THAT THE CURRENT $100 MINIMUM STATUTORY PENALTY
IN CIVIL ACTIONS SHOULD REMAIN IN THE ACT FOR TWO REASONS.  FIRST, THE SCOPE OF
CIVIL LIABILITY FOR THIS PENALTY WOULD BE SUBSTANTIALLY REDUCED SO THAT ONLY THOSE
TERMS WHICH ARE CENTRAL TO A CREDIT TRANSACTION ARE COVERED. THESE DISCLOSURES ARE
SO IMPORTANT IN **\*18** CREDIT SHOPPING THAT A CREDITOR WHO GIVES INACCURATE INFORMA-
TION SHOULD FACE A DEFINITE PENALTY.  IN ADDITION, WITHOUT A FIXED PENALTY, THERE
WILL BE MANY INSTANCES WHERE ACTUAL DAMAGES ALONE WILL PROVIDE LITTLE OR NO EF-
FECTIVE REMEDY FOR THE CONSUMER WHO RELIED ON INACCURATE DISCLOSURES TO HIS DETRI-
MENT.

THIS SECTION WOULD ALSO ELIMINATE AMBIGUITY AS TO A CREDITOR'S MAXIMUM LIABILITY
IN MULTIPLE CLASS ACTIONS.  WHERE SEVERAL CLASS ACTIONS ARE INSTITUTED AGAINST A
CREDITOR AS A RESULT OF THE SAME DISCLOSURE VIOLATION, THE BILL MAKES CLEAR THAT
THE CREDITOR'S MAXIMUM AGGREGATE LIABILITY COULD NOT EXCEED $500,000 OR 1 PERCENT
OF NET WORTH, WHICHEVER IS LESS.  THE COMMITTEE BELIEVES THE FEDERAL JUDICIARY
WILL DETERMINE THROUGH ITS OWN PROCEDURES HOW MULTIPLE CLASS ACTIONS SHOULD PRO-
CEED.

THE BILL ALSO MAKES EXPLICIT THAT A CONSUMER MAY INSTITUTE SUIT UNDER SECTION
130 TO ENFORCE THE RIGHT OF RESCISSION AND RECOVER COSTS AND ATTORNEY'S FEES IN A
SUCCESSFUL ACTION.

THE DEFENSE TO CIVIL LIABILITY UNDER SECTION 130(B) HAS BEEN AMENDED TO EXPAND
FROM 15 TO 60 DAYS THE TIME IN WHICH THE CREDITOR MAY APPROPRIATELY ADJUST THE
CONSUMER'S ACCOUNT AFTER DISCOVERING AN ERROR IN ORDER TO AVOID CIVIL LIABILITY.
THE COMMITTEE BELIEVES THE CURRENT 15-DAY LIMIT DOES NOT PROVIDE ADEQUATE TIME
WHERE OPEN-END ACCOUNTS ARE INVOLVED.

THE DEFENSE FOR BONA FIDE ERRORS IN SECTION 130(C) WOULD ALSO BE AMENDED TO
PROVIDE THAT A BONA FIDE ERROR MAY INCLUDE CALCULATION AND CLERICAL ERRORS AS WELL
AS COMPUTER ERRORS AND FAULTY PROGRAMING.  THE COMMITTEE INTENDS THIS AMENDMENT TO
PROVIDE PROTECTION WHERE ERRORS ARE CLERICAL OR MECHANICAL IN NATURE.  THE COMMIT-
TEE DOES NOT INTEND THIS DEFENSE TO APPLY TO ERRORS WHICH RESULT FROM ERRONEOUS
LEGAL JUDGMENTS AS TO THE ACT'S REQUIREMENTS.

FINALLY, THIS SECTION ADDRESSES DEFENSIVE TRUTH IN LENDING CLAIMS BY CONSUMERS
IN TWO RESPECTS.  FIRST, SECTION 130(H) IS AMENDED TO STATE **\*\*296** EXPLICITLY THAT
AN ACTION UNDER THE ACT BY A CONSUMER WHO IS THEN IN DEFAULT OF THE UNDERLYING OB-
LIGATION IS NOT, BY ITSELF, A PROHIBITED OFFSET. ALSO, A PROVISION IS ADDED PER-
MITTING ACTIONS IN RECOUPMENT OR OFFSET BEYOND THE ONE YEAR STATUTE OF LIMITA-
TIONS, EXCEPT WHERE OTHERWISE PROVIDED BY STATE LAW OR RULES OF CIVIL PROCEDURE.

SECTION 16.  LIABILITY OF ASSIGNEES.-- THIS SECTION ELIMINATES TWO UNCERTAINTIES
UNDER PRESENT LAW AS TO AN ASSIGNEE'S LIABILITY FOR AN ORIGINAL CREDITOR'S VIOLA-
TION OF THE ACT.

UNDER PRESENT LAW, AN ASSIGNEE IS GENERALLY LIABLE ONLY WHERE A VIOLATION IS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

S. REP. 96-73, S. Rep. No. 73, 96TH Cong., 1ST Sess. 1979, 1980 U.S.C.C.A.N. 280, 1979 WL 10376 (Leg.Hist.)
**(Cite as: S. REP. 96-73, 1980 U.S.C.C.A.N. 280)**

'APPARENT ON THE FACE' OF THE DISCLOSURE STATEMENT. WHAT TYPES OF VIOLATIONS ARE COVERED IS UNCLEAR.  THIS SECTION PROVIDES THAT VIOLATIONS ARE APPARENT ON THE FACE OF A DISCLOSURE STATEMENT WHEN DISCLOSURES ARE INACCURATE OR INCOMPLETE BASED ON THE STATEMENT OR OTHER DOCUMENTS INVOLVED, AND WHERE INCORRECT TERMINOLOGY IS UTILIZED.

IN ADDITION, THIS SECTION ELIMINATES AMBIGUITY ON THE QUESTION OF ASSIGNEE LIABILITY FOR RESCISSION BY STATING EXPLICITLY THAT A CONSUMER'S EXERCISE OF THIS RIGHT IS EFFECTIVE AGAINST AN ASSIGNEE. WITHOUT SUCH PROTECTION FOR THE CONSUMER, THE RIGHT OF RESCISSION WOULD PROVIDE LITTLE OR NO EFFECTIVE REMEDY.

SECTION 17.  LIABILITY OF CREDIT CARDHOLDER.-- THIS SECTION ELIMINATES THE ACT'S CURRENT REQUIREMENT THAT CREDITORS WHO ISSUE CREDIT CARDS PROVIDE **19** THE CONSUMER WITH A POSTAGE-PAID SELF-ADDRESSED ENVELOPE FOR USE IN NOTIFYING THE CREDITOR IN THE EVENT THE CARD IS LOST OR STOLEN.  AVAILABLE DATA INDICATE THAT FEW CONSUMERS WHO LOSE A CREDIT CARD NOTIFY THE CARD ISSUER BY MAIL BECAUSE CONTACT BY TELEPHONE IS MORE CONVENIENT AND MORE LIKELY TO MINIMIZE THE CONSUMER'S LIABILITY FOR UNAUTHORIZED USE.  BY DELETING THE REQUIREMENT OF A POSTAGE-PAID ENVELOPE AND REQUIRING INSTEAD A NOTICE OF HOW TO CONTACT THE CREDITOR, AN UNNECESSARY CREDITOR COST WILL BE ELIMINATED WITHOUT INCREASED RISK TO THE CONSUMER.

A TECHNICAL CHANGE IS ALSO MADE WITH REGARD TO CONSUMER LIABILITY FOR UNAUTHORIZED CREDIT CARD USES.  THE ACT'S PRESENT WORDING RELIEVES A CONSUMER FROM FURTHER LIABILITY AFTER HE NOTIFIES THE CARD ISSUER OF THE LOSS OF HIS CARD.  THIS SECTION WOULD AMEND THE WORDING TO PROVIDE THAT THE CONSUMER'S LIABILITY WOULD BE CURTAILED AFTER THE CARD ISSUER IS MADE AWARE OF THE LOSS, REGARDLESS OF WHO ACTUALLY NOTIFIES THE CREDITOR.

SECTION 18.  DISSEMINATION OF ANNUAL PERCENTAGE RATES.-- THIS SECTION REQUIRES THE FEDERAL RESERVE BOARD TO INITIATE A PILOT PROJECT TO DETERMINE THE FEASIBILITY AND VALUE OF 'SHOPPER'S GUIDES TO CREDIT.'  THESE PUBLICATIONS WOULD BE ISSUED IN METROPOLITAN AREAS PERIODICALLY, PREFERABLY MONTHLY, AND WOULD LIST THE ANNUAL PERCENTAGE RATES CHARGED BY CREDITORS IN THAT AREA FOR COMMON TYPES OF LOANS.  THE BOARD IS AUTHORIZED TO CONTRACT WITH QUALIFIED GROUPS OR STATE OFFICIALS TO CARRY OUT THIS RESPONSIBILITY.

THE COMMITTEE BELIEVES THAT SHOPPER'S GUIDES TO CREDIT HAVE THE POTENTIAL TO BE OF GREAT BENEFIT, BOTH AS A SHOPPING TOOL FOR CONSUMERS AND AS A STIMULUS FOR INCREASED COMPETITION AMONG LENDERS.

IN CARRYING OUT THIS RESPONSIBILITY, THE COMMITTEE EXPECTS THE BOARD TO CONSULT WITH THE MASSACHUSETTS BANKING COMMISSIONER AND OTHER STATE OFFICIALS OR PRIVATE GROUPS WITH EXPERIENCE IN THIS TYPE OF PROJECT.  IN ADDITION, THE COMMITTEE BELIEVES THAT SHOPPER'S GUIDES SHOULD HAVE A BRIEF EXPLANATION OF WHAT AN ANNUAL PERCENTAGE RATE IS, AS WELL AS **297** OTHER INFORMATION WHICH IS LIKELY TO BE HELPFUL WHEN WISELY SHOPPING FOR CREDIT.

UPON COMPLETION OF THE PROJECT, THE COMMITTEE EXPECTS THE BOARD TO REPORT IN DETAIL ON THE SCOPE OF ITS PROJECT, THE CONTENT OF ITS SHOPPER'S GUIDES, THE RESPONSE BY CONSUMERS AND CREDITORS, THE PROJECT'S EFFECT ON COMPETITION, AND WHAT OTHER MEASURES MIGHT BE HELPFUL IN INCREASING RATE DISSEMINATION TO CONSUMERS AND STIMULATING RATE COMPETITION.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.