IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARMANDO PLASCENCIA and MELANIA
PLASCENCIA, individually and on
behalf of all others similarly
situated,

        Plaintiffs,

    v.

LENDING 1ST MORTGAGE; LENDING 1ST
MORTGAGE, LLC; and EMC MORTGAGE
CORPORATION,

        Defendants.

_____/

No. C 07-4485 CW

ORDER GRANTING IN
PART PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION

    Plaintiffs Armando and Melania Plascencia charge Defendants
Lending 1st Mortgage, Lending 1st Mortgage, LLC (collectively,
Lending 1st) and EMC Mortgage Corp. with violating the Truth in
Lending Act and California statutory and common law in connection
with the sale of certain residential mortgage products.  Plaintiffs
now move for class certification.  Defendants oppose the motion.
The matter was heard on April 9, 2009.  Having considered oral
argument and all of the papers submitted by the parties, the Court
grants the motion in part and denies it in part.

BACKGROUND

According to the complaint, Lending 1st sells a variety of home loans, including option adjustable rate mortgages (OARMs). EMC is in the business of purchasing, packaging, and securitizing some or all of Lending 1st's OARMs. In May, 2006, Plaintiffs purchased an OARM in the amount of $395,000 from Lending 1st to refinance their primary residence in San Leandro, California. The terms of their mortgage are complex and are set out in extensive detail in an Adjustable Rate Note (the Note).

As with all adjustable rate loans, the interest rate on Plaintiffs' loan was pegged to a variable index and thus changed over time. One unusual feature of Plaintiffs' loan, however, was a low initial interest rate of one percent. This "teaser" rate resulted in an initial minimum monthly payment of $1,270, which is equal to the monthly payment on a fully amortized thirty-year loan with a one-percent interest rate. On July 1, 2006 -- the date of Plaintiffs' first loan payment -- the interest rate on their mortgage increased substantially from the teaser rate of one percent. As of that date, the loan began accruing interest at a variable rate that changed each month and was calculated by adding 3.375% to an Index equal to the twelve month average of the annual yields on actively traded U.S. Treasury Securities adjusted to a constant maturity of one year.[1]

Although Plaintiffs' interest rate rose almost immediately,

---

[1]As a point of reference, the annual yield on such securities was 5.22% in July, 2006. See http://www.federalreserve.gov/releases/h15/data/Monthly/H15_TCMNOM_Y1.txt (last accessed on April 2, 2009).

their minimum monthly payment did not.  This is because the Note limited to once a year the frequency of initial increases to the minimum monthly payment.  Because of this limit, Plaintiffs' minimum monthly payment did not increase until July, 2007.  In addition, the Note imposed a "payment cap" on the amount of each initial increase to the minimum monthly payment.  Under this cap, the minimum monthly payment could only increase by 7.5% for each of the first four years.  However, subsequent increases were not limited by the payment cap.  Instead, with the fifth increase, the payment would reset so that the remaining principal would be paid off with equal monthly payments over the remaining term of the loan.

Because Plaintiffs' initial minimum monthly payment was based on a one-percent interest rate and did not go up along with the almost immediate increase in their interest rate, their mortgage began accruing more interest each month than the entire amount of their minimum payment.  The interest that was left unpaid at the end of each month was added to the outstanding principal and began accumulating interest itself.  As a result, Plaintiffs' principal grew even while they made the minimum payment each month.  This process is known as negative amortization.  Assuming the value of the property subject to a mortgage remains constant, the effect of negative amortization is to reduce the borrower's equity in the property.

The Note limited the amount of negative amortization that could occur on Plaintiffs' loan such that the principal could never rise to more than 115% of its original amount.  Once the principal

3

United States District Court
For the Northern District of California

rose to this level, Plaintiffs' minimum monthly payment would be reset so that the principal would be paid off with equal monthly payments over the remaining term of the loan.  This provision overrode the ordinary rule that the minimum monthly payment could rise only once a year and could increase by only 7.5% for each of the first four years.

In addition to the Note, Plaintiffs were given a Federal Truth-in-Lending Disclosure Statement (the Statement) before finalizing their mortgage.  The Statement specified that the annual percentage rate (APR) on the mortgage was 7.68%.  The Statement also included a schedule of estimated payments based on the initial one-percent interest rate and the subsequent interest rate increase described above.[2]  The schedule listed an initial minimum payment of $1,270 that increased by 7.5% on July 1 of each year until September 1, 2010.  On that date, which is just over four years into the repayment term, the minimum monthly payment was shown to increase from $1,697 to $3,314.  It was set to remain at this level until the loan was paid off in 2036.  The dramatic increase is apparently attributable to the projection that the principal would reach 115% of its original amount in or about August, 2010, due to negative amortization.  The schedule assumed that Plaintiffs would make no more than the minimum monthly payment at any time.

Plaintiffs claim they were unaware that their loan was subject to negative amortization.  They assert that the disclosures they

---

[2]The Statement did not explain how the APR was calculated, but it appears to be the composite rate based on the value of the Index at the time the Statement was issued.

4

1  were provided were inadequate to inform them that, although the

2  minimum monthly payment would remain low for several years, the

3  interest rate would increase almost immediately, causing negative

4  amortization and a consequent loss of equity.

5       EMC is not a direct lender.  Rather, it purchases mortgages

6  from lenders, then bundles, securitizes and sells them.  EMC

7  purchased Plaintiffs' mortgage from Lending 1st and began servicing

8  it shortly after the loan was issued.  In May, 2007, Plaintiffs

9  refinanced their home again with a new mortgage.  In doing so, they

10  repaid in full the OARM that Lending 1st had issued them.

11       Plaintiffs brought this action on behalf of themselves and

12  similarly situated individuals who purchased OARMs from Lending

13  1st.  They claim that Defendants violated the Truth in Lending Act

14  (TILA), 15 U.S.C. § 1601 et seq., because Lending 1st did not

15  clearly and conspicuously disclose: 1) the actual interest rate on

16  Plaintiffs' mortgage; 2) the fact that the one-percent interest

17  rate was a discounted rate; and 3) the fact that negative

18  amortization was certain to occur.  Plaintiffs also charge

19  Defendants with violating California's Unfair Competition Law

20  (UCL), Cal. Bus. & Prof. Code § 17200 et seq., by committing

21  unlawful, unfair and fraudulent business practices.  Finally,

22  Plaintiffs charge Defendants with common law fraud.

23       Plaintiffs now seek certification of three classes.  They

24  originally defined the classes as follows:

25       1.   National Class: All individuals in the United States
             who, between August 29, 2006 and the date Notice is
26           mailed to the Class, have an ARM loan that was sold
             or owned by Defendants which was secured by real
27           property on their primary residence located within

28                                    5

the United States.

2.   The California Category I Class: All individuals
     who, between August 29, 2003 and the date Notice is
     mailed to the Class, have an ARM loan that was sold
     or owned by Defendants which was secured by real
     property located in the State of California.

3.   The California Category II Class: All individuals
     who, between August 29, 2003 and the date Notice is
     mailed to the class, have an ARM loan that was sold
     or owned by Defendants which was secured by real
     property located within the United States (excluding
     California) and was approved by Defendants within
     the State of California.

Pls.' Mot. at 6-7. In their reply brief, Plaintiffs clarified that they do not propose that the class include all borrowers whose ARMs were purchased by EMC, but rather only those borrowers whose loans were originated by Lending 1st.

LEGAL STANDARD

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b) further provides that a case may be certified as a class action only if one of the following is true:

6

1          (1) prosecuting separate actions by or against individual
2   class members would create a risk of:

3              (A) inconsistent or varying adjudications with
    respect to individual class members that would
    establish incompatible standards of conduct for the
4   party opposing the class; or

5              (B) adjudications with respect to individual class
    members that, as a practical matter, would be
6   dispositive of the interests of the other members
    not parties to the individual adjudications or would
7   substantially impair or impede their ability to
    protect their interests;

8
9   (2) the party opposing the class has acted or refused to
    act on grounds that apply generally to the class, so that
    final injunctive relief or corresponding declaratory
10  relief is appropriate respecting the class as a whole; or

11  (3) the court finds that the questions of law or fact
    common to class members predominate over any questions
12  affecting only individual members, and that a class
    action is superior to other available methods for fairly
13  and efficiently adjudicating the controversy.  The
    matters pertinent to these findings include:
14

15             (A) the class members' interests in individually
    controlling the prosecution or defense of separate
    actions;
16
17             (B) the extent and nature of any litigation
    concerning the controversy already begun by or
    against class members;
18
19             (C) the desirability or undesirability of
    concentrating the litigation of the claims in the
    particular forum; and
20
21             (D) the likely difficulties in managing a class
    action.

22  Fed. R. Civ. P. 23(b).  Plaintiffs assert that this case qualifies

23  for class certification under subdivisions (b)(2) and (b)(3).

24      A plaintiff seeking class certification bears the burden of

25  demonstrating that each element of Rule 23 is satisfied, and a

26  district court may certify a class only if it determines that the

27  plaintiff has borne its burden.  General Tel. Co. v. Falcon, 457

28

United States District Court
For the Northern District of California

U.S. 147, 158-61 (1982); <u>Doninger v. Pac. Nw. Bell, Inc.</u>, 564 F.2d 1304, 1308 (9th Cir. 1977).  In making this determination, the court may not consider the merits of the plaintiff's claims. <u>Burkhalter Travel Agency v. MacFarms Int'l, Inc.</u>, 141 F.R.D. 144, 152 (N.D. Cal. 1991).  Rather, the court must take the substantive allegations of the complaint as true.  <u>Blackie v. Barrack</u>, 524 F.2d 891, 901 (9th Cir. 1975).  Nevertheless, the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action.  <u>Burkhalter</u>, 141 F.R.D. at 152.  In addition, the court may consider supplemental evidentiary submissions of the parties.  <u>In re Methionine Antitrust Litig.</u>, 204 F.R.D. 161, 163 (N.D. Cal. 2001); <u>see also</u> <u>Moore v. Hughes Helicopters, Inc.</u>, 708 F.2d 475, 480 (9th Cir. 1983) (noting that "some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a)"; however, "it is improper to advance a decision on the merits at the class certification stage").  Ultimately, it is in the district court's discretion whether a class should be certified.  <u>Molski v. Gleich</u>, 318 F.3d 937, 946 (9th Cir. 2003); <u>Burkhalter</u>, 141 F.R.D. at 152.

DISCUSSION

I.   Rule 23(a) Requirements

     A.   Numerosity

     Although the parties have not presented the Court with evidence of the exact size of the class, Defendants appear to concede that the number of individuals who purchased OARMs from Lending 1st during the relevant time period is great enough to

8

satisfy the numerosity requirement.  The Court therefore finds that the numerosity requirement has been satisfied.  If the class turns out to be less numerous than expected, Defendants may move to decertify it.

B.   Commonality

Rule 23 contains two related commonality provisions.  Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(b)(3), in turn, requires that such common questions predominate over individual ones.

The Ninth Circuit has explained that Rule 23(a)(2) does not preclude class certification if fewer than all questions of law or fact are common to the class:

> The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3).  Indeed, Rule 23(a)(2) has been construed permissively.  All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

Rule 23(b)(3), in contrast, requires not just that some common questions exist, but that those common questions predominate.  In Hanlon, the Ninth Circuit discussed the relationship between Rule 23(a)(2) and Rule 23(b)(3):

> The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3).  In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the

United States District Court
For the Northern District of California

common and individual issues.  When common questions
present a significant aspect of the case and they can be
resolved for all members of the class in a single
adjudication, there is clear justification for handling
the dispute on a representative rather than on an
individual basis.

Id. at 1022 (citations and internal quotation marks omitted).

Although Defendants assert that this case does not satisfy
Rule 23(a)'s commonality provision, their arguments actually focus
on whether common issues predominate, and thus are more
appropriately directed at the issue of certification under Rule
23(b)(3), discussed below.  Rule 23(a) only requires that there be
some common issues of fact and law.  The class members' claims
clearly have something in common: all class members purchased an
OARM from Lending 1st, and their claims are based on a common
theory of liability.  Rule 23(a)'s commonality requirement has
therefore been satisfied.

C.   Typicality

Rule 23(a)(3)'s typicality requirement provides that a "class
representative must be part of the class and possess the same
interest and suffer the same injury as the class members." Falcon,
457 U.S. at 156 (quoting E. Tex. Motor Freight Sys., Inc. v.
Rodriquez, 431 U.S. 395, 403 (1977)) (internal quotation marks
omitted).  The purpose of the requirement is "to assure that the
interest of the named representative aligns with the interests of
the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th
Cir. 1992).  Rule 23(a)(3) is satisfied where unnamed class members
have the same or similar injury as the named plaintiffs, the action
is based on conduct which is not unique to the named plaintiffs,

10

United States District Court
For the Northern District of California

1   and other class members have been injured by the same course of

2   conduct.  <u>Id.</u>  Class certification is inappropriate, however,

3   "where a putative class representative is subject to unique

4   defenses which threaten to become the focus of the litigation."

5   <u>Id.</u> (quoting <u>Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce,</u>

6   <u>Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d Cir. 1990), <u>cert.</u>

7   <u>denied</u>, 498 U.S. 1025 (1991)).

8        Plaintiffs' claims are all based on loans issued by Lending

9   1st without proper disclosures.  Plaintiffs' claims are "reasonably

10  co-extensive with those of absent class members."  <u>Hanlon v.</u>

11  <u>Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th Cir. 1998).  Plaintiffs

12  therefore presumably satisfy the typicality requirement.  In

13  support of the opposite conclusion, Defendants point to particular

14  facts that are unique to Plaintiffs' claims -- in particular, the

15  facts that Plaintiffs purportedly did not read the loan disclosure

16  documents and that their loan documents may have differed from

17  those of other class members.  These particularities, however, do

18  not render Plaintiffs' claims atypical in the sense that they

19  differ from the claims of most class members.  In actuality,

20  Defendants' argument goes to whether the claims can be proved on a

21  class-wide basis or whether, instead, no class member's claims can

22  be established without looking at the particular circumstances of

23  that class member.  Thus, this issue is more appropriately

24  characterized as going to Rule 23(b)(3)'s predominance requirement,

25  and is discussed below.

26       Although Plaintiffs' claims are, on their face, typical of

27  other class members' claims, their TILA claim nonetheless fails to

28                                  11

1   satisfy the requirements of Rule 23(a)(3) because Plaintiffs are

2   not members of the national TILA class.  That class, by definition,

3   encompasses only individuals who purchased an OARM after August 29,

4   2006, one year prior to the date on which the complaint was filed.

5   Plaintiffs purchased their loan in May, 2006.  This alone defeats a

6   finding of typicality.  See Falcon, 457 U.S. at 156.

7        There is a reason why the class definition was drafted so as

8   to exclude Plaintiffs: Claims based on loans which, like theirs,

9   were taken out prior to August 29, 2006 would presumably be barred

10  by TILA's one-year statute of limitations.  Plaintiffs' claims are

11  dependent on an exception to the statute of limitations.[3]  Although

12  Plaintiffs argue that the limitations period should be equitably

13  tolled because they did not have a reasonable opportunity to

14  discover Defendants' alleged TILA violations until they began

15  receiving their statements and realized that the amount of their

16  principal was increasing over time, the statute of limitations

17  issue has been, and will continue to be, a major issue in the

18  defense of the TILA claim.  This fact renders Plaintiffs' claim

19  ─────────────────

20       [3]Defendants argue that Plaintiffs lack standing to sue for
    TILA violations on behalf of the class because their claims are
21  barred by the statute of limitations.  The doctrine of standing,
    however, is concerned with whether there is a "case" or
22  "controversy" sufficient to meet the requirements of Article III.
    The standing inquiry asks whether a plaintiff has suffered an
23  actual or imminent injury that is fairly traceable to the
    defendant's conduct and that is likely to be redressed by a
24  favorable court decision.  Salmon Spawning & Recovery Alliance v.
    Gutierrez, 545 F.3d 1220, 1225 (9th Cir. 2008).  Lending 1st argues
25  that Plaintiffs' TILA claim fails the redressability prong of
    standing because it is barred by the statute of limitations and
26  thus no relief is available.  This mischaracterizes the nature of
    redressability requirement.  See generally Sprint Commc'ns Co.,
27  L.P. v. APCC Servs., Inc., ___ U.S. ___, 128 S. Ct. 2531, 2542-43
    (2008).

28                                  12

atypical from those of the class.  Moreover, summary judgment could be granted against Plaintiffs on their TILA claim on the basis of the statute of limitations, which would leave no named plaintiff to pursue the claim on behalf of the class at trial.

In their reply, Plaintiffs propose modifying the TILA class definition to encompass individuals who purchased an OARM between March 17, 2006 and the date on which the class notice is mailed. The 165-day extension in the class period is based on the amount of time Plaintiffs believe it would take the typical class member after purchasing the OARM to discover that negative amortization was certain to occur.  This modification would both render Plaintiffs members of the class and make the statute of limitations exception available to certain other class members -- specifically, those who purchased loans between March 17, 2006 and August 29, 2007 -- thus remedying the typicality problem.  However, whether any of these class members' claims are subject to equitable tolling will depend on an individualized factual inquiry.  See King v. California, 784 F.2d 910, 915 (9th Cir. 1986) ("[T]he doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action.") (emphasis added).  Some class members may have known that their loans would negatively amortize as soon as they purchased them.  Depending on the circumstances, other class members may not reasonably be expected to have learned of negative amortization until more than 165 days after they purchased their loans.  To adjudicate the equitable tolling issue

13

United States District Court
For the Northern District of California

properly would thus require the type of individualized evidence that is inappropriate in the liability phase of a class action. Nor would it be an appropriate application of the equitable tolling doctrine for the Court arbitrarily to select a specific number of days beyond the normal limitations period to toll the statute for all class members.

The Court concludes that, although Plaintiffs' UCL and fraud claims are typical of those of other class members, their TILA claim is not.  Class certification of the TILA claim is therefore not appropriate.

D.    Adequacy

Rule 23(a)(4)'s adequacy requirement ensures that absent class members are afforded adequate representation before entry of a judgment which binds them.  <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th Cir. 1998).  "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  <u>Id.</u>

Defendants have not pointed to a conflict between Plaintiffs and other class members, and there is no reason to believe that Plaintiffs and their counsel will not vigorously pursue this action on behalf of class members.  Accordingly, the adequacy requirement is satisfied.

II.    Certification Under Rule 23(b)(2)

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that

14

apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Plaintiffs contend that class certification is appropriate because Defendants have acted in a way that applies generally to the class and because they seek an injunction "requiring Defendants to provide [them] and the Class members with what they led them to believe that they were getting: a no-negative amortization home loan that would apply monthly payments to both principal <u>and</u> interest." Pls.' Mot. at 11. They also note, "Successful prosecution of this suit would, in part, seek a re-allocation of Class members' prior payments and a re-accounting of the amounts Class members are shown on Defendants' books to owe." <u>Id.</u>

Although Defendants are alleged to have acted in a way that applies generally to the class members, this case does not satisfy the "final injunctive relief or corresponding declaratory relief" prong of Rule 23(b)(2). Certification is only appropriate under this subdivision when the primary remedy sought is an injunction. A class seeking monetary damages may be certified pursuant to Rule 23(b)(2) only where such relief is "merely incidental to the primary claim for injunctive relief." <u>Zinser v. Accufix Research Institute, Inc.</u>, 253 F.3d 1180, 1195 (9th Cir. 2001). The complaint lists twelve items under the heading "Prayer for Relief." The first four forms of relief specified are actual, compensatory, consequential and punitive damages. An injunction is not among the twelve items, although a non-specific request for "equitable relief" is included. Even the injunction requested by Plaintiffs

15

would offer exclusively monetary relief to class members, whether or not it is labeled as damages. Moreover, although it is not clear exactly what Plaintiffs are seeking, it appears that the requested injunction could be not be applied on a class-wide basis because it is likely that a number of class members, like Plaintiffs themselves, have refinanced the OARMs they were issued by Lending 1st.

The Court concludes that certification under Rule 23(b)(2) is not available.

IV.  Certification Under Rule 23(b)(3)

    A.  Predominance

    "The predominance inquiry of Rule 23(b)(3) asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  The focus is on the relationship between the common and individual issues." In re Wells Fargo Home Mortgage Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (internal quotation marks and citations omitted).  Plaintiffs argue generally that this case satisfies the predominance requirement because they intend to prove their claims based solely on documentary evidence that is common to the class.  However, determining whether common questions predominate on any of the three claims asserted in this action requires an analysis of the elements of those claims.

        1.  TILA Claim

    Although the Court finds that Plaintiffs' TILA claim is not typical of the TILA claims of class members, because counsel may move to substitute a new class representative whose TILA claim satisfies the typicality requirement, the Court will address the

16

1   issue of whether the TILA claim satisfies the Rule 23(b)(3)

2   predominance requirement.

3       Plaintiffs are correct that class members' TILA claims will

4   turn exclusively on the written disclosures that were provided to

5   class members in connection with their loan purchases; either the

6   documents satisfy TILA's technical requirements or they do not.

7   There is no need to look into the state of mind or particular

8   circumstances of individual class members.

9       In its opposition to the present motion, EMC argued that there

10  is no uniform set of loan documents that was provided to all class

11  members, and determining whether TILA has been violated will

12  require an evaluation of the specific documents that were provided

13  to individual class members.  When it made this argument, however,

14  EMC was under the impression that the class extended to individuals

15  who purchased loans from lenders other than Lending 1st and whose

16  loans were subsequently purchased by EMC.  In their reply and at

17  the hearing, Plaintiffs clarified that they intended the class

18  definition to encompass only individuals who purchased their loans

19  from Lending 1st.  They also pointed out that, in responding to

20  their discovery requests, Lending 1st stated that "Plaintiffs' loan

21  documents constitute the only version of Option ARM loans made

22  available" by Lending 1st.  Bronson Dec. Ex. 1 at 4.

23      Because the TILA claim is subject to proof by evidence of a

24  generalized nature, this claim satisfies Rule 23(b)(3)'s

25  predominance requirement.

26

27

28                                    17

1          2.   Fraud Claim

2        Plaintiffs' fraud claim is based on an omission rather than an

3   affirmative misrepresentation; Plaintiffs allege that the loan

4   documents did <u>not</u> disclose that making only the minimum monthly

5   payments would result in negative amortization, and that the one-

6   percent "teaser" interest rate would remain in effect for a short

7   amount of time.[4]  "The elements of an action for fraud and deceit

8   based on concealment are: (1) the defendant must have concealed or

9   suppressed a material fact, (2) the defendant must have been under

10  a duty to disclose the fact to the plaintiff, (3) the defendant

11  must have intentionally concealed or suppressed the fact with the

12  intent to defraud the plaintiff, (4) the plaintiff must have been

13  unaware of the fact and would not have acted as he did if he had

14  known of the concealed or suppressed fact, and (5) as a result of

15  the concealment or suppression of the fact, the plaintiff must have

16  sustained damage."  <u>Blickman Turkus, LP v. MF Downtown Sunnyvale,</u>

17  <u>LLC</u>, 162 Cal. App. 4th 858, 868 (2008) (quoting <u>Marketing West,</u>

18  <u>Inc. v. Sanyo Fisher (USA) Corp.</u>, 6 Cal. App. 4th 603, 612-613

19  (1992)).

20  _____

21      [4]Plaintiffs do allege that the Note's affirmative
    representation, "I will pay principal and interest by making a
22  payment every month," is misleading.  As the Court has noted in
    previous orders, however, the Note contains no promise, express or
23  implied, that Plaintiffs' payment would always be applied to both
    principal and interest.  The Note states that each monthly payment
24  will be applied to interest before Principal and that the monthly
    payment may be less than the amount of interest each month.
25  Whether the payment would be applied to principal depended on
    whether it was large enough to cover the entire amount of interest
26  that had accrued during the preceding month.  Plaintiff's fraud
    claim is premised on Defendants' failure to disclose the true
27  interest rate and the fact that negative amortization <u>would</u> occur
    if only the minimum monthly payments were made.

28                              18

Class certification of a fraud claim may be appropriate if the plaintiffs allege that an entire class of people has been defrauded by a common course of conduct.  For example, in In re First Alliance Mortgage Co., 471 F.3d 977 (9th Cir. 2006), the Ninth Circuit upheld class certification where a lender employed a "centrally-orchestrated scheme to mislead borrowers through a standardized protocol [that] sales agents were carefully trained to perform, which resulted in a large class of borrowers entering into loan agreements they would not have entered had they known the true terms."  Id. at 991.  Like the defendants in First Alliance, Defendants are alleged to have acted in a uniform way toward all class members -- here, by supplying class members with loan documents that failed to state in clear language material terms of the loan.

Defendants argue that, even though their own actions may involve common questions of fact, proof of the fourth element of Plaintiffs' fraud claim -- that class members were unaware of the undisclosed loan terms and would not have acted as they did if they had known of the terms -- will require looking at the individual circumstances of each class member and will cause individual questions to predominate.  However, courts have recognized that this element, which is often phrased in terms of reliance or causation, may be presumed in the case of a material fraudulent omission.  As the Supreme Court has held, in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."  Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972).  Rather, "[a]ll that is

19

necessary is that the facts withheld be material," in the sense that a reasonable person "might have considered them important" in making his or her decision.  Id. at 153-54.  Similarly, the California Supreme Court has held that class certification is appropriate even where there may be individual issues of reliance because "it is not necessary to show reliance upon false representations by direct evidence."  Vasquez v. Superior Court, 4 Cal. 3d 800, 814 (1974).  Rather, "reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect."  Id. (internal quotation marks omitted).

Here, a jury may find that the initial interest rate and negative amortization features of the loans were material in the sense that a reasonable person would have wanted to know about them.  The jury thus may presume that class members would not have agreed to purchase their loans if Defendants had clearly disclosed that the initial one percent rate was ephemeral and that negative amortization was certain to occur if only the minimum payments were made.  Defendants, of course, may attempt to rebut this presumption at trial by introducing evidence that particular class members were either aware of the loan terms or would have purchased the loans even if the terms were clearly disclosed in the documents. Defendants have pointed to evidence, for example, suggesting that Plaintiffs themselves did not carefully read the loan documents they were given, and Defendants have argued that any omission in

20

United States District Court
For the Northern District of California

1    the documents was not the cause of Plaintiffs' injury.[5]  Although

2    evidence of this sort is individualized in nature, the issue of

3    damages suffered by class members "is invariably an individual

4    question and does not defeat class action treatment."  Blackie v.

5    Barrack, 524 F.2d 891, 905 (9th Cir. 1975).

6         Because the fraud claim arises from a common course of conduct

7    on Defendants' part, the Court concludes that common issues will

8    predominate and the claim may be certified under Rule 23(b)(3).

9              3.  UCL Claim

10        The UCL prohibits any "unlawful, unfair or fraudulent business

11   act or practice."  Cal. Bus. & Prof. Code § 17200.  It incorporates

12   other laws and treats violations of those laws as unlawful business

13   practices independently actionable under state law.  Chabner v.

14   United Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000).

15   Violation of almost any federal, state, or local law may serve as

16   the basis for a UCL claim.  Saunders v. Superior Ct., 27 Cal. App.

17   4th 832, 838-39 (1994).  In addition, a business practice may be

18   "unfair or fraudulent in violation of the UCL even if the practice

19   does not violate any law."  Olszewski v. Scripps Health, 30 Cal.

20   4th 798, 827 (2003).  With respect to fraudulent conduct, the UCL

21   prohibits any activity that is "likely to deceive" members of the

22   public.  Puentes v. Wells Fargo Home Mortgage, Inc., 160 Cal. App.

23   4th 638, 645 (2008).  Thus, unlike a claim for common law fraud,

24   liability under the UCL does not require reliance and injury.

25   _____

26        [5]This evidence goes to the merits of Plaintiffs' individual
     fraud claim and is not so clear as to negate, as a matter of law,
27   the reliance element of that claim.

28                                    21

**United States District Court**
For the Northern District of California

1    Prior to 2004, any person acting on behalf of the general

2  public could bring suit under the UCL; standing "did not depend on

3  a showing of injury or damage."  <u>Californians For Disability Rights</u>

4  <u>v. Mervyn's, LLC</u>, 39 Cal. 4th 223, 228 (2006).  However,

5  Proposition 64, approved by the voters in 2004, amended the UCL to

6  permit suits only by the Attorney General and certain other

7  government attorneys, or by individuals who have "suffered injury

8  in fact and ha[ve] lost money or property as a result of unfair

9  competition."  <u>Id.</u>  (quoting Cal. Bus. & Prof. Code § 17204).

10    The degree to which the UCL claim involves individual issues

11  turns on whether Proposition 64 imposed a new standing requirement

12  that <u>all</u> class members must satisfy, or whether it is sufficient

13  for Plaintiffs to show that <u>they</u> have standing.  The California

14  Supreme Court recently answered this question in <u>In re Tobacco II</u>

15  <u>Cases</u>, 46 Cal. 4th 298 (2009).  The court clarified that only the

16  named plaintiff in a UCL class action need demonstrate injury and

17  causation.

18    Plaintiffs may prove with generalized evidence that

19  Defendants' conduct was "likely to deceive" members of the public.

20  The individual circumstances of each class member's loan need not

21  be examined because the class members are not required to prove

22  reliance and damage.  Common issues will thus predominate on the

23  UCL claim.  Moreover, although Proposition 64 requires that

24  Plaintiffs themselves must demonstrate reliance on Defendants'

25  omissions, the court in <u>In re Tobacco II Cases</u> set out a liberal

26  approach to the reliance inquiry:

27    While a plaintiff must show that the misrepresentation

28                                    22

**United States District Court**
For the Northern District of California

was an immediate cause of the injury-producing conduct,
the plaintiff need not demonstrate it was the only cause.
It is not necessary that the plaintiff's reliance upon
the truth of the fraudulent misrepresentation be the sole
or even the predominant or decisive factor influencing
his conduct.  It is enough that the representation has
played a substantial part, and so had been a substantial
factor, in influencing his decision.  Moreover, a
presumption, or at least an inference, of reliance arises
wherever there is a showing that a misrepresentation was
material.  A misrepresentation is judged to be "material"
if a reasonable man would attach importance to its
existence or nonexistence in determining his choice of
action in the transaction in question, and as such
materiality is generally a question of fact unless the
fact misrepresented is so obviously unimportant that the
jury could not reasonably find that a reasonable man
would have been influenced by it.

<u>Id.</u> at 326-27 (internal quotation marks, alteration marks and

citations omitted).  Just as the materiality of the interest rate

and negative amortization terms permits a presumption of reliance

in connection with the fraud claim, it also permits a presumption

of reliance for the purposes of Proposition 64 standing.

The Court concludes that common issues will predominate on the

UCL claim and that Plaintiffs have made a sufficient showing of

reliance to serve as class representatives.

B.   Superiority

The Court finds that adjudicating class members' claims in a

single action would be superior to maintaining a multiplicity of

individual actions involving similar legal and factual issues.

Although Defendants argue that class action treatment is not

superior because they believe individual questions will

predominate, they do not identify any other reason why individual

actions would be preferable.  The Court concludes that this action

satisfies Rule 23(b)(3)'s superiority requirement.

1

CONCLUSION

2    For the foregoing reasons, Plaintiffs' motion for class

3 certification (Docket No. 94) is GRANTED IN PART and DENIED IN

4 PART.  The Court certifies Plaintiffs' fraud and UCL claims for

5 class treatment.  However, because Plaintiffs' TILA claim is not

6 typical of those of the class, the Court will not certify the

7 claim.  EMC's motion to file supplemental briefing concerning <u>In re</u>

8 <u>Tobacco II Cases</u> (Docket No. 174) is DENIED.  EMC's motion for

9 leave to file a corrected brief (Docket No. 166) is GRANTED.

10    Within five days of the date of this order, Plaintiffs shall

11 submit a proposed order certifying a class that conforms with this

12 order and that resolves the ambiguities in the original class

13 definition.

14    IT IS SO ORDERED.

15

16 Dated: 8/21/09

17                                              CLAUDIA WILKEN
                                                United States District Judge

18

19

20

21

22

23

24

25

26

27

28                                   24